```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                                      :
UNITED STATES OF AMERICA,                             :    S3 09 Cr. 581 (WHP)
                                                      :
            - against -                               :    MEMORANDUM & ORDER
                                                      :
PAUL M. DAUGERDAS, et al.,                            :
                                                      :
                        Defendants.                   :
                                                      :
------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/23/10

WILLIAM H. PAULEY III, United States District Judge:

      Defendants Paul Daugerdas, Donna Guerin, Denis Field, Raymond Craig Brubaker and David Parse move to dismiss Counts Two through Twenty-Three and Counts Twenty-Six through Thirty of the Third Superseding Indictment (the "Indictment") for failure to allege the element of willfulness. For the following reasons, Defendants' motion is denied.

## BACKGROUND

### I. The Tax Shelters

      Counts Two through Twenty-Three of the Indictment charge Defendants with aiding and abetting tax evasion in connection with the design, marketing, and implementation of four tax shelters: the Short Sale, Short Options Strategy ("SOS"), Swaps, and HOMER tax shelters. (Indictment ("Ind.") ¶¶ 26-34.)[1] Each tax shelter consisted of a complex, pre-planned series of transactions involving the purchase and sale of securities or the execution of swap agreements through various entities, including partnerships, limited liability companies

---

[1] Counts Twenty-Six through Thirty charge Daugerdas and Defendant Erwin Mayer—who originally joined this motion but recently pled guilty—with utilizing the shelters to evade taxes on their individual tax returns.

1

("LLCs"), and trusts. (Ind. ¶¶ 26-34.) While the intricacies of each tax shelter need not be parsed in detail, this Court summarizes the mechanics of one—the SOS shelter—to illustrate the Indictment's allegations.

In the SOS tax shelter, the taxpayer client purchases a long foreign digital currency option ("Option") from a cooperating bank through an LLC. (Ind. ¶ 28.) The premium for the long Option is equal to the amount of tax loss sought by the client. (Ind. ¶ 28.) At the same time, the client sells a short Option to the bank through the LLC for a "virtually offsetting premium." (Ind. ¶ 28.) Because the two transactions are executed simultaneously, the client pays only the difference between the premium for the long Option and the proceeds of the sale of the short Option (the "Net Premium") to the bank. (Ind. ¶ 28.) The Net Premium was typically 1% of the desired tax loss. (Ind. ¶ 28.)

The Options provided the client with a one-third chance of doubling the Net Premium, a two-thirds chance of losing the Net Premium, and a remote possibility of earning a significant profit, known as the "sweet spot." (Ind. ¶¶ 28, 37.) The Indictment alleges that while the likelihood of hitting the sweet spot was "essentially nil," Defendants "portray[ed it] as a remote but real possibility" in order to allow their clients to "argue to the IRS that the sweet spot provided profit potential . . . ." (Ind. ¶ 37.)

After executing the Options transactions, the client contributed the Options to a partnership.[2] (Ind. ¶ 29.) Based on Defendants' advice, clients treated the contribution of the long Option as an increase in their adjusted tax basis in the partnership but did not treat the contribution of the short Option as a corresponding liability. (Ind. ¶ 29.) Thus, a client was able

---

[2] The short Option was sold to the bank and the Indictment does not particularize the manner in which it was contributed to the partnership. However, the precise details of the Options transfers are not at issue on this motion.

to claim a net increase in his adjusted basis in the partnership equal to the premium for the long Option, i.e., the amount of the desired tax loss. While not alleged explicitly in the Indictment, the parties acknowledge that the decision not to treat the short Option as a liability was based on the United States Tax Court's decision in Helmer v. Comm'r of Internal Revenue, 34 T.C.M. 727 (1975). The tax strategy articulated in Helmer was prohibited by the IRS in 2005. See Treas. Reg. § 1.752-1.

After receiving the Options, the partnership purchased a small amount of foreign currency or stock with funds supplied by the client; alternatively, the client contributed stock or foreign currency to the partnership. (Ind. ¶ 29.) Thereafter, the partnership closed the Options positions, dissolved the partnership, and sold its only remaining asset—the stock or foreign currency. (Ind. ¶ 29.) That allowed the client to treat the sale as generating a loss equal to the desired tax loss because the stepped-up basis gained from the contribution of the now-closed Options far exceeded the value of that asset. (Ind. ¶ 29.) Thus, clients were able to claim deductions equal to their desired tax loss, even though they put at risk only 1%, and stood to gain only 2%, of that loss.

II. The Indictment's Allegations

The Indictment's core allegations are that the tax shelters lacked economic substance and business purpose. (Ind. ¶¶ 35, 38, 68, 69.) The Indictment alleges that Defendants designed the tax shelters to appear legitimate, even though they understood that the "IRS would disallow the claimed tax benefits[] and seek to impose substantial penalties" if the true nature of the transactions were revealed. (Ind. ¶¶ 24-25.) The Indictment further alleges that in implementing the tax shelters, Defendants (i) drafted fraudulent opinion letters attesting to

their legality and business purpose (Ind. ¶¶ 43-47); (ii) backdated transactions to ensure deductibility of losses in certain years (Ind. ¶ 48); (iii) fabricated transactional documents to "maximize the appearance that each tax shelter was an investment undertaken to generate profits, and to minimize the likelihood that the IRS would learn that the tax shelters were actually designed to create tax losses" (Ind. ¶¶ 49-50); and (iv) prepared fraudulent tax returns reporting the benefits received under the tax shelters (Ind. ¶ 51).

Defendants challenge the sufficiency of the Indictment's allegations of willfulness, particularly as they relate to the fees associated with structuring the tax shelters. The Indictment states that:

> instead of . . . paying . . . income taxes generally between 20% and 40% of [] their taxable income, [Defendants'] clients could choose the amount of tax loss or benefits, and pay . . . an 'all-in' cost generally equal to 5 to 10% of the desired tax loss or benefit. This all-in cost included the fees of [Jenkins & Gilchrist LLP], BDO [Seidman LLP], Bank B, third-party referral sources, and/or others, as well as the [N]et [P]remium to Bank A used to execute the purported 'investments' . . . .

(Ind. ¶ 24.) The Indictment alleges "[t]here was no reasonable possibility for [Defendants'] clients to make a profit, given the duration and structure of the tax shelters and the fees required to be paid to obtain the losses." (Ind. ¶¶ 35, 38.) According to the Indictment, this conclusion is based on a comparison of the fees charged for structuring the tax shelters and the potential profit generated by the underlying transactions. Defendants allegedly charged their clients an "all-in" fee of between 3% and 10% of the desired tax loss. (Ind. ¶ 39.) Because the clients' maximum realistic profit under the shelters was less than the all-in fee, there was no real opportunity for profit. (See, e.g., Ind. ¶¶ 38-39.)

Defendants contend that the Indictment fails to allege willfulness because there was no objectively knowable duty requiring that fees be considered when calculating a

4

transaction's profitability. Defendants argue that if fees are removed from the equation, the tax shelters exposed their clients to market risk by offering the possibility of doubling the Net Premium. As a corollary, Defendants assert due process violations for lack of fair notice that their conduct was criminal.

## DISCUSSION

I. Legal Standard

    a. Sufficiency of the Indictment

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." United States v. Pirro, 212 F.3d 86, 91 (2d Cir. 2000). Nevertheless, "an indictment is sufficient [so long as] it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999).

    b. Tax Evasion

Section 7201 of the tax code prohibits the "willfull[] attempt[] in any manner to evade or defeat any tax imposed by this title or the payment thereof . . . ." 26 U.S.C. § 7201.[3] To establish criminal tax evasion under § 7201, "the government must prove beyond a reasonable doubt: (1) willfulness; (2) the existence of a tax deficiency; and (3) an affirmative act constituting evasion or attempted evasion of tax." United States v. D'Agostino, 145 F.3d 69, 72 (2d Cir. 1998); accord Sansone v. United States, 380 U.S. 343, 351 (1965).

---

[3] The Indictment also charges Defendants under 18 U.S.C § 2, an aiding-and-abetting provision permitting a person who assists in the commission of an offense to be punished as a principal.

"[I]gnorance of the law or a mistake of law is [generally] no defense to criminal prosecution . . . [b]ased on the notion that the law is definite and knowable[]" and that every person is charged with its knowledge. Cheek v. United States, 498 U.S. 192, 199 (1991). However, the complexity of the tax laws led Congress to "soften[] the impact of the common-law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses." Cheek, 498 U.S. at 200. Thus, a defendant is guilty of tax evasion only if he acted "willfully," which is defined as a "voluntary, intentional violation of a known legal duty." Cheek, 498 U.S. at 201; accord United States v. Regan, 937 F.2d 823, 827 (2d Cir. 1991). Accordingly, "[w]illfulness . . . requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." Cheek, 498 U.S. at 201.

      c. Economic Substance Doctrine

"[T]he economic substance doctrine is . . . a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the [tax laws], tax benefits not be afforded [if they are] based on transactions lacking in economic substance." Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1354 (Fed. Cir. 2006). The doctrine's fundamentals are straightforward: a transaction lacking economic substance cannot give rise to a tax deductible loss. See Regan, 937 F.2d at 828 (describing "economic substance [as] a necessary element of a tax deductible loss"); Altria Grp., Inc. v. United States, 694 F. Supp. 2d 259, 281 (S.D.N.Y. 2010) ("Under the [economic substance] doctrine, a claimed deduction may be disallowed if a transaction has no business purpose or economic effect other than the creation of tax deductions." (quotations omitted)); see also United States v. Atkins, 869 F.2d 135, 139 (2d Cir. 1989) ("[T]he doctrine of substance versus form is well ensconced in tax law."). The

economic substance doctrine is properly applied in a criminal case. See Atkins, 869 F.2d at 140 ("Appellants' . . . contention that the district court's charge on lack of substance has no place in a criminal prosecution is without merit."); see also United States v. Pfaff, Nos. 09-1702-cr (L), 09-1707-cr (CON), 09-1790-cr (CON), 2010 WL 4188245, at *2 (2d Cir. Oct. 26, 2010) ("[E]conomic substance law is not unconstitutionally vague: It has been applied in criminal cases before[.]"); United States v. Wexler, 31 F.3d 117, 127 (3d Cir. 1994) ("Our rule of disregarding sham transactions for federal taxation purposes continues in full force today[.]"); United States v. Fleming, 19 F.3d 1325, 1330 (10th Cir. 1994) ("There was sufficient evidence for the jury to find that the 'transfers' at issue were not 'transfers' at all but were sham transactions set up solely to avoid the payment of the transfer tax.").

Generally speaking, a transaction lacks economic substance if it "cannot with reason be said to have purpose, substance, or utility apart from [its] anticipated tax consequences." Lee v. Comm'r of Internal Revenue, 155 F.3d 584, 586 (2d Cir. 1998); see Goldstein v. Comm'r of Internal Revenue, 364 F.2d 734, 740 (2d Cir. 1966). As the Court of Appeals has observed, "it is immaterial whether we are talking about 'substantial economic reality,' 'substance over form,' 'sham' transactions, or the like; rather the question is whether . . . the transaction affects a beneficial interest other than the reduction of taxes." United States v. Ingredient Tech. Corp., 698 F.2d 88, 94 (2d Cir. 1983); see also Atkins, 869 F.2d at 139-40 ("Transactions without economic substance and sham transactions are [not] fundamentally distinct legal concepts . . . .") (internal quotations omitted).

"As understood by the Courts of Appeals, the [economic substance] doctrine has two components: 'business purpose' and 'economic effect.'"[4] Altria, 694 F. Supp. 2d at 281. The precise formulation given these components has varied. Compare Regan, 937 F.2d at 828 (approving a jury instruction that a transaction has no economic effect if it "was subject to no market risk"), with United States v. Ruble, No. S1 05 Cr. 888 (LAK), 2009 WL 911035, at *2 (S.D.N.Y. Apr. 2, 2009) (instructing the jury that a transaction has no economic effect if it lacks the "reasonable possibility that [it] would result in a profit").[5] Indeed, courts have recognized that the economic substance doctrine should be applied flexibly to properly evaluate sham transactions. See Regan, 937 F.2d at 828 ("[A] charge [on the economic substance doctrine] that is adequate and proper in one case may not play the same role in another case involving a different set of facts. The district court must tailor its instructions to the facts of the case before it."); Gilman v. Comm'r of Internal Revenue, 933 F.2d 143, 148 (2d Cir. 1991) (noting the "flexible nature of the [economic substance doctrine] analysis").

II. Willfulness

Defendants argue that the Indictment fails to allege willfulness for three principal reasons: (1) a transaction's economic effect is measured by whether it subjects the taxpayer to market risk, not whether it provides a realistic possibility of profit; (2) even if the possibility-of-profit test is proper, there was no known legal duty to account for fees when measuring a

---

[4] The precise wording of the jury charge on the economic substance doctrine will be determined at a later stage.

[5] While recent civil decisions have held that a transaction lacks economic substance if it fails to satisfy either of the doctrine's components, see, e.g., Altria, 694 F. Supp. 2d at 283 ("[T]he better reading of Second Circuit precedent is that a transaction may fail for lack of a legitimate business purpose or economic effect"), this Court need not resolve whether the same is true in the criminal context because the Indictment satisfies both.

8

transaction's profit potential; and (3) <u>Helmer</u>-based tax strategies were not outlawed by the IRS until after Defendants executed the transactions at issue. All three arguments are unavailing.

First, Defendants mistakenly assert that the economic effect component of the economic substance doctrine asks only whether a transaction subjects the taxpayer to market risk. "The nature of the economic substance analysis is flexible." <u>Long Term Capital Holdings v. United States</u>, 330 F. Supp. 2d 122, 171 (D. Conn. 2004); <u>see</u> <u>Gilman</u>, 933 F.2d at 148. Thus, while the Court of Appeals has approved jury charges adopting the "market risk" test, <u>see, e.g.</u>, <u>Atkins</u>, 869 F.2d at 140, it has cautioned that the economic substance doctrine is not subject to an exclusive formulation, <u>see</u> <u>Regan</u>, 937 F.2d at 828 ("[A] charge that is adequate and proper in one case may not play the same role in another case involving a different set of facts."). Accordingly, the Indictment is not deficient merely because it alleges that the tax shelters provided no reasonable possibility of profit. <u>See, e.g.</u>, <u>Stobie Creek Invs. LLC v. United States</u>, 608 F.3d 1366, 1378 (Fed. Cir. 2010) (considering whether there was "a reasonable possibility of making a profit from . . . transaction[s]" similar to those at issue here); <u>see also</u> <u>Pfaff</u>, 2010 WL 4188245, at *1 (upholding a jury charge instructing "that a transaction lacks non-tax economic effect when there is 'no reasonable possibility that the transaction would result in a profit'").

Defendants' second argument—that there was no known legal duty to account for fees when measuring profit potential—mischaracterizes the duty allegedly breached by Defendants. The Indictment charges that the tax shelters lacked economic effect and business purpose. Accordingly, the proper inquiry under <u>Cheek</u> is whether there existed a known legal duty to avoid claiming deductions based on transactions lacking economic substance. <u>Cheek</u>, 498 U.S. at 198. Notwithstanding Defendants' attempts to undermine the economic substance doctrine, this duty is well-established. <u>See</u> <u>Cemco Investors, LLC v. United States</u>, 515 F.3d

749, 752 (7th Cir. 2008) (Easterbrook, J.) (noting the existence of "the pre-existing norm that transactions with no economic substance don't reduce people's taxes"); Ferguson v. Comm'r of Internal Revenue, 29 F.3d 98, 101 (2d Cir. 1994) ("An activity will not provide the basis for deductions if it lacks economic substance."); DeMartino v. Comm'r of Internal Revenue, 862 F.2d 400, 406 (2d Cir. 1988) ("The basic rule of law is that taxation is based upon substance, not form.").

While Defendants frame the relationship between fees and profitability as relating to the question of whether there was a known legal duty, that relationship actually concerns how courts formulate the economic effect component of the economic substance doctrine. And as to that inquiry, courts regularly account for fees in measuring a transaction's profitability. See, e.g., Stobie Creek, 608 F.3d at 1378 (accounting for fees in determining the profitability of transactions similar to those at issue here); Goldstein, 364 F.2d at 740 (finding that "all economic profit disappear[ed]" once the fees for planning the transactions were included); Ruble, 2009 WL 911035, at *2 (defendant acted willfully if he "knew that the strategy in question had no reasonable possibility of making a profit, in excess of the costs incurred without regard to tax benefits" (emphasis added)); Long Term, 330 F. Supp. 2d at 175 (considering that the taxpayer "was willing to expend disproportionate out of pocket costs of several million dollars" against "a reasonably expected return of $1,959,633"). Because the Indictment alleges that the all-in fee was integral to the tax shelters, such a formulation is particularly appropriate. Indeed, ignoring fees associated with a tax shelter conflicts with rational decision making—absent tax benefits, no rational investor would entertain an investment where the total costs exceeded any potential return. See Stobie Creek, 608 F.3d at 1378 ("Expected rates of return are revealing, particularly

10

if they account for costs and fees associated with implementing the transaction; a reasonable investor would consider such expenses when evaluating an investment's likely profitability.").

Finally, Defendants' argument that <u>Helmer</u>-based tax shelters were not deemed illegal until after the transactions at issue were executed is a red herring. While the Indictment describes transactions apparently modeled on <u>Helmer</u>, its center of gravity focuses on the shelters as a whole and the fact that in the aggregate they were shams. Thus, Defendants' technical adherence to the contingent liability rule articulated in <u>Helmer</u> is irrelevant. The economic substance doctrine is designed to ferret out improper conduct "despite literal compliance" with tax laws. <u>Coltec</u>, 454 F.3d at 1354. Accordingly, the Indictment adequately alleges a "violation of a known legal duty." <u>Cheek</u>, 498 U.S. at 201.

### III. Due Process

As a corollary to their willfulness argument, Defendants contend that the Indictment violates their due process rights to fair notice of criminal conduct. However, such concerns are not present here. "All the Due Process clause requires is that the law give sufficient warnings that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." <u>Ingredient Tech.</u>, 698 F.2d at 96. The allegations that Defendants intentionally backdated documents and issued fraudulent opinion letters in connection with the tax shelters are more than sufficient to satisfy due process. <u>See</u> <u>Atkins</u>, 869 F.2d at 139 ("[Defendants] contend that they were deprived of due process because they did not know in advance that their conduct was unlawful. In view of the proven falsification and backdating of documents, the secret oral agreements, the lies and the concealment of facts, this

11

argument borders on the specious."); <u>Ingredient Tech.</u>, 698 F.2d at 96 ("[S]urely the defendants knew they were committing a wrongful act.  The resale component of the agreement was concealed.  The auditors were lied to, as were the attorneys.  The secret letter sealed with wax was hidden in a safe and then destroyed.").  Accordingly, Defendants' due process claim is misplaced.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Counts Two through Twenty-Three and Counts Twenty-Six through Thirty of the Indictment for failure to allege willfulness is denied. The Clerk of the Court is directed to terminate the motion pending at Docket No. 102.

Dated: December 23, 2010
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record*