UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | § § § |
| v. | § § |
| PAUL M. DAUGERDAS, DONNA GUERIN, DENIS FIELD, and DAVID PARSE, | § § § § § § |
| Defendants. | § |

S3 No. 09 Cr. 581 (WHP)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
DAVID PARSE'S MOTION FOR A NEW TRIAL BASED
ON INEFFECTIVE ASSISTANCE OF COUNSEL**

## TABLE OF AUTHORITIES

**PAGE**

**CASES**

Babb v. Crosby, 197 Fed. Appx. 885 (11th Cir. 2006)...................................................5

Carrera v. Ayers, 670 F.3d 938 (9th Cir. 2011).............................................................6

Chappee v. Vose, 843 F.2d 25 (1st Cir. 1988)................................................................6

United States v. Berkovich, 168 F.3d 64 (2d Cir. 1999) ............................................5-6

United States v. Biaggi, 909 F.2d 662 (2d Cir. 1990) ....................................................9

United States v. DeCecco, 467 Fed. Appx. 85 (2d Cir. 2012).......................................6

United States v. Kaplan, 490 F.3d 110 (2d Cir. 2007)...................................................9

United States v. Nersesian, 824 F.2d 1294 (2d Cir. 1987) ............................................6

United States v. Tarricone, 21 F.3d 474 (2d Cir. 1994).................................................6

White v. Lee, 238 F.3d 418 (4th Cir. 2000)....................................................................9

Wilson v. Mazzuca, 570 F.3d 490 (2d Cir. 2009)...........................................................6

Wood v. Allen, 130 S. Ct. 841 (2010) ........................................................................6-7

**OTHER AUTHORITIES**

Findley & Scott, The Multiple Dimensions of Tunnel Vision in Criminal Cases,
    2006 Wis. L. Rev. .................................................................................................2

This reply brief is respectfully submitted in further support of David Parse's motion for a new trial based on ineffective assistance of counsel. Several points in the government's brief merit a response.

1. The government's brief begins with this sentence: "[a]rmed with the knowledge that juror Catherine Conrad was a New York attorney who had been suspended from practice for alcohol-related issues, attorneys for David Parse decided to keep that knowledge from the Court -- and keep Catherine Conrad on the jury -- in an effort to obtain acquittals for their client." (G. Mem. 1-2)(emphasis added). Were that a fair characterization of the record, the conduct of Mr. Parse's trial counsel could well be labeled "strategic." But the reality is far different. As discussed in our opening brief and reflected in the Court's June 4 opinion, Mr. Parse's trial counsel did not keep information from the Court in an effort to gain him acquittals. Rather, they persuaded themselves that it was "inconceivable" that Juror No. 1 was the suspended lawyer and therefore mistakenly concluded that there was nothing to disclose.[1]

The hearing record confirms this point in several ways. First, the record shows that on May 12, 2011, when trial counsel decided not to bring the issue to the Court's attention, there was no discussion that if Juror No. 1 was the suspended lawyer she should be kept on the jury to aid the defense.[2] The brief conversation that occurred that day involved Ms. Brune and

---

[1] The government writes that after hearing Conrad's voir dire answers, the Brune lawyers "wanted her on the jury." (G. Mem. 9). That, of course, is true. The person whom Conrad was impersonating -- a stay-at-home Bronxville wife whose husband owned a bus company and who admired Lynn Swann -- would be appealing to most trial lawyers. That is why Conrad adopted the persona.

[2] At the hearing, Ms. Trzaskoma gave this testimony:

> Q. In that plaza conversation on the afternoon of May 12th with Ms. Brune and Ms. Edelstein, was there any discussion of whether Ms. Conrad, Juror No. 1, was pro prosecution or pro defense?

1

Ms. Edelstein convincing Ms. Trzaskoma that any concern that Juror No. 1 might be the suspended lawyer was baseless. Thus, Juror No. 1's knowledge of legal terms (as evidenced by her jury note) was dismissed as a product of her being a party to a civil suit.[3] After hearing from her seniors, Ms. Trzaskoma was quickly convinced that they were right.[4] As a result, all three lawyers left the courthouse plaza secure in the erroneous belief that Juror No. 1 was who she purported to be.

Second, the record reflects that if Mr. Parse's lawyers had concluded that Juror No. 1 was a suspended lawyer, they would not have wanted her on the jury. As the Court knows, the defense jury consultant had opined that "a recovering addict tends to be all about taking personal responsibility and she'll be more focused on that than on the government's burden of proof, so that if this is the same person you should strike her for cause [or] get her off with a peremptory." (Tr. 262). That assessment resonated with Mr. Parse's lawyers. See Tr. 310 (Brune: "I have a great deal of faith in our jury consultant, and he told us that he did not think it

---

        A.    No.

(Tr. 87).

[3]    At the hearing, Ms. Trzaskoma gave this testimony:

> Ms. Edelstein said, well, it seems to me that those concepts of vicarious liability and respondeat superior could have come up but that she probably got them there [in the civil suit] and if she was actually a trained lawyer she would know that those two concepts have no role at all in this case that we just spent ten weeks on, and I think I said at that point I felt that I had just maybe gone down a rabbit hole unnecessarily.

(Tr. 60). That Mr. Parse's lawyers took disconfirming information (the jury note) and found a way to dismiss it and maintain their original belief (that Conrad was not the suspended lawyer) is a familiar phenomenon. See Findley & Scott, The Multiple Dimensions of Tunnel Vision in Criminal Cases, 2006 Wis. L. Rev. 291, 314-15 ("[p]eople can be quite facile at explaining away events that are inconsistent with their established beliefs").

[4]    See Findley & Scott, supra, at 309 (when a theory is "provided by a person of superior status in a team effort ... even ... obvious ... disconfirming information may ... be dismissed").

2

was a good idea to have a recovering alcoholic on the jury").[5] Moreover, his lawyers "liked [the] alternates" and would have substituted one had they thought that Conrad was perpetrating a fraud. (Tr. 34). Thus, while the government asserts that "a reasonable defense attorney would have been happy to have [on the jury] a suspended attorney with legal troubles and facing a state regulatory body seeking to disbar her" (G. Mem. 15), there is not a shred of evidence that Mr. Parse's lawyers shared that jaundiced view.

Third, the conduct of Mr. Parse's lawyers after the plaza conversation confirms that their decision to leave Conrad on the jury was not intended to gain a tactical edge. As the Court will recall, the next day (or the day after), Ms. Trzaskoma and Ms. Brune had separate conversations with lawyers from the Kramer, Levin firm, in which the Brune lawyers reported that there was a suspended lawyer with the same name as Juror No. 1 but that "it was not the same person." (Tr. 361, 369). The Kramer, Levin lawyers testified to those conversations, and

---

[5] Ms. Brune testified as follows:

> Q. If you had believed that she was a suspended lawyer, indeed a suspended lawyer with an alcohol dependency, would you have wanted her on the jury?
>
> A. No.
>
> Q. Why not?
>
> A. First of all, the case involved lawyers, and I think that would have been very distracting and would have not made her a good juror. Second, I have a great deal of faith in our jury consultant, and he told us that he did not think it was a good idea to have a recovering alcoholic on the jury. Third, the most important thing that any juror is supposed to do is follow the judge's instructions. If I had known that a person was prepared to defy the Court by lying on voir dire, I would never have had any confidence that the person would follow the Court's instructions. <u>So there's no way that I wanted this person, if indeed she was a suspended lawyer, to sit on this jury.</u>

(Tr. 309-10)(emphasis added).

3


their credibility has never been questioned. Those conversations go far to demonstrate that Mr. Parse's lawyers kept Juror No. 1 on the jury not because they believed she was the suspended lawyer but because they believed she wasn't. Had Mr. Parse's lawyers been gaming the system, their conversations with the Kramer, Levin lawyers would have been quite different or, more likely, would not have occurred.

All of this leads to the obvious conclusion: the suggestion that Mr. Parse's trial counsel kept Conrad on the jury to increase the likelihood of acquittals is absurd.

2. The reality here is that the lawyers who made the decision not to disclose to the Court -- Ms. Brune and Ms. Edelstein -- did not know all the information that Ms. Trzaskoma did. Most significantly, they had not seen the Westlaw report, which she had received earlier that day. As a result, it was too easy for them to convince themselves (and, in turn, to convince Ms. Trzaskoma) that Juror No. 1 could not possibly be the suspended lawyer. To them, the conclusion seemed so obvious that there was no need to inform the Court of it.[6] Theirs was not a strategic decision in the Strickland sense of the term: it was not made to advance Mr. Parse's cause. It was a misjudgment by otherwise highly capable lawyers, who should have recognized that informing the Court was the sound and easy course.

---

[6] At the post-trial hearing, Ms. Trzaskoma gave this testimony:

> Q. But you ultimately never brought it to the Court's attention during the trial, right?
>
> A. I believe we -- I believe that that was so far of a remote possibility that there was -- I just, I didn't believe that our juror was the suspended lawyer.

(Tr. 63); see also Tr. 353 (Edelstein: "after we discussed the issue and concluded that it was inconceivable that Juror No. 1 was the suspended lawyer, we didn't see a reason to bring the fact that there was a suspended lawyer with the name Catherine Conrad to the Court's attention, that there was nothing we were going to ask the Court to do at that point").

4

If there were any doubt on the score, it is resolved by this revealing interchange between the Court and Ms. Edelstein at the hearing:

> THE COURT: In the middle of jury deliberations, this Court displaced Juror No. 11 because of a health emergency, replaced him with an alternate after much discussion with counsel and over the objection of the government, and directed the jury to restart its jury deliberations. Did you give any consideration at that time to raising the issue that you discussed in the park on May 12 with Ms. Brune and Ms. Trzaskoma regarding Juror No. 1?
>
> THE WITNESS: No. I continued to believe that Juror No. 1 was who she said she was. That didn't occur to me, no.

(Tr. 356)(emphasis added). "That didn't occur to me" is not a strategic call.

3.  Just as the government has distorted the record to find a strategic decision where none exists, it has cited cases that are inapposite here. Take, for example, Babb v. Crosby, 197 Fed. Appx. 885 (11th Cir. 2006). There, in a sexual assault case, a potential juror announced that she had been the victim of sexual abuse and therefore might not be able to be fair. Despite that statement, defense counsel did not strike the potential juror, for three reasons: (i) he "wanted a jury with . . . independent thinkers"; (ii) he considered her previous service on a hung jury significant; and (iii) he believed other potential jurors were worse. Id. at 887. On these facts, the Eleventh Circuit held that counsel's conduct was not deficient. Counsel had made a "strategic decision in keeping [the juror] on the jury," which was entitled to deference. Id. at 888. He had weighed the competing considerations and determined that, on balance, not striking the juror was the more favorable course.

The other cases that the government cites are of the same character. In each, defense counsel chose course "X" after considering alternatives because he believed "X" gave his client the best chance of prevailing. See, e.g., United States v. Berkovich, 168 F.3d 64, 68 (2d Cir. 1999)(counsel's decision to agree to the admissibility of certain evidence was "a

reasonable trial strategy," since, "[w]hile [counsel] made certain concessions . . . he also gained certain advantages"); United States v. DeCecco, 467 Fed. Appx. 85, 89 (2d Cir. 2012)("counsel's statement [at sentencing] that [the defendant was] 'addicted to stealing' was clearly a tactical decision designed to make [the defendant] sympathetic and to suggest that he was not fully responsible for his criminal actions"); United States v. Tarricone, 21 F.3d 474, 476 (2d Cir. 1994)(counsel's failure to call a handwriting expert was not deficient performance where he "could reasonably have concluded that the jury could, on its own, recognize that the handwriting on the . . . agreement was not [his client's]"; United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987)(counsel's decision not to make an opening statement was a reasonable "choice of strategy [since it freed him] to develop any defense that might materialize as the prosecution presented its case"); Carrera v. Ayers, 670 F.3d 938, 944-45 & n.13 (9th Cir. 2011)(counsel's decision not to bring a Batson challenge after the prosecutor struck six Hispanic jurors was reasonable, where the record demonstrated that there were "reasons independent of group bias [for] each challenge" and therefore the motion would have failed).[7]

    To state the facts of these cases is to recognize that they are different from those here. Mr. Parse's lawyers chose not to inform the Court what they knew about a Catherine Conrad who was a suspended lawyer because they erroneously concluded that Juror No. 1 was not her. Their decision was not a tactical choice between alternative strategies. Simply stated, counsel were not thinking about advancing Mr. Parse's interests; sadly, at the end of a long and hard-fought trial, they were not thinking enough. See Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009)("oversight, carelessness, [or] ineptitude" is not sound trial strategy); see also Wood v. Allen, 130 S. Ct. 841, 853 (2010)(Stevens, J., dissenting)("[a] decision cannot be fairly

---

[7] Chappee v. Vose, 843 F.2d 25 (1st Cir. 1988), which the government also cites, was discussed and distinguished in our opening brief. (Parse Mem. 6-7).

6

characterized as 'strategic' unless it is a conscious choice between two legitimate and rationale alternatives . . . [borne] of deliberation and not happenstance, inattention or neglect").

4. Perhaps the most breathtaking sentence in the government's brief is this: "<u>the gamble made by [Mr. Parse's] lawyers [in keeping Conrad on the jury] was partially successful</u>" as shown by the fact that he was convicted of only two of the six charges against him. (G. Mem. 22); <u>see</u> <u>also</u> G. Mem. 2 (referring to the acquittals as "the benefits of his trial counsel's strategic maneuvering"). It is hard to imagine that anyone who attended the post-trial hearing or read the Court's opinion could seriously contend that Conrad's presence on the jury helped Mr. Parse. Conrad was not fighting <u>for</u> Mr. Parse in the jury room. As her post-trial letter demonstrates, she was "fight[ing] the good fight" to persuade her fellow jurors to convict him across the board. Letter of Catherine Conrad 5/25/11 ("I wanted to convict [him] 100%"). Surely, it is time for the government to acknowledge that Conrad was <u>its</u> partisan and that Mr. Parse, like his co-defendants, was severely prejudiced by her participation in the case.

5. The government seeks to uphold the convictions by arguing that the proof against Mr. Parse was "overwhelming." (G. Mem. 16-23). That is a difficult argument when one recognizes that Mr. Parse was situated similarly to Craig Brubaker, who was acquitted on all counts.[8] No doubt aware of the difficulty, the government focuses on the three so-called "backdating transactions" in which Mr. Parse participated, but Mr. Brubaker did not. Although the government succeeded at trial in characterizing these as "backdating," the term does not really fit. As discussed in our opening brief, no Deutsche Bank documents were backdated or altered. Instead, a transaction that took place on, say, December 28, 2001, was corrected on February 12, 2002, and the corrective transaction was shown on the client's February 2002

---

[8] Together, Parse and Brubaker -- the two Deutsche Bank brokers -- were acquitted of 14 of the 16 counts in which they were charged.

7

account statement with the notation "as of" December 28 to reflect that it was effected at that day's prices.[9] Thus, had the IRS audited, it would have found that Deutsche Bank's records accurately reflected when the transactions -- the original and correction -- occurred.

Put simply, the proof may have been overwhelming that Mr. Parse participated in the three corrective transactions, but it was underwhelming that he did so with fraudulent intent. Although Mr. Parse was briefly an accountant in a former life, there was no evidence that he was familiar with the annual accounting rule.[10] He was a broker not a tax advisor or preparer. See e.g., G. Br. 19 ("Donna Guerin then caused American Express Tax and Business Services to fraudulently report the transaction on the Blair and Coleman Tax Returns"). Like so many others, he relied on the Jenkens lawyers to give sound advice. Tellingly, during the charging conference, the Court recognized the point. It noted that Mr. Parse was "the most unfamiliar [of the defendants] with what the tax laws were" and that there seemed to be no "evidence that

---

[9] Thus, the government is wrong when it asserts that "Parse's assistant [sent] revised Toperek account statements and trade tickets" to AMEX accountants for use in preparing Toporek's tax returns. (G. Mem. 20)(emphasis added). No Deutsche Bank records were revised. See also G. Mem. 21 (erroneously indicating that Mr. Parse's assistant sent revised Deutsche Bank statements . . . to accountants at BDO Seidman for the Arnoff family)(emphasis added). Notably, Mr. Parse's assistant gave this testimony:

> Q. Once a statement was in final, so far as you know, no one could change it?
> A. Correct.
> Q. You never changed a statement in the way that I've described?
> A. No.
> Q. And to your knowledge, no one else did either?
> A. Not to my knowledge.

(Tr. 5612).

[10] As the trial record shows, Mr. Parse obtained his undergraduate degree in accounting in 1984 and worked for two years at Touche Ross & Co. before entering business school. There is no evidence that his work at Touche Ross involved tax preparation.

8

would say that Mr. Parse had direct knowledge about it." (Trial Tr. 8040-41). Thus, like in many criminal cases, <u>actus</u> <u>reus</u> was clear but <u>mens</u> <u>rea</u> was not.

At bottom, then, the government's claim is that Mr. Parse must have known that the three transactions were part of a tax fraud because any accountant would know. (G. Mem. 21)("any accountant knows and understands [that what occurred] is flagrantly violative of the [annual accounting] rule"). But "must have known" is not the stuff of which strong criminal cases are made. See <u>United States v. Kaplan</u>, 490 F.3d 110, 120-21 (2d Cir. 2007)(noting that the claim that the defendant knew because "everybody else did" has little force absent proof that their "knowledge was communicated to [the defendant] or that [he] had been exposed to the same sources from which [they] derived their knowledge of the fraud"); <u>United States v. Biaggi</u>, 909 F.2d 662, 681 (2d Cir. 1990)("knowledge, though inferable from circumstances, must be based on evidence, not speculation"). In short, the combination of weak evidence and Conrad's poisonous presence makes the prejudice to Mr. Parse plain.[11]

---

[11] At the very end of its brief, the government cites <u>White v. Lee</u>, 238 F.3d 418 (4th Cir. 2000), noting that, there, a strategy was found to be reasonable because it succeeded in persuading "at least one ... jur[or]" not to recommend a death sentence. In <u>White</u>, defense counsel called two witnesses in the penalty phase: (i) the defendant who expressed remorse and (ii) a psychiatric expert who testified that the defendant had a "mixed personality disorder" which impaired his capacity to conform to the law and manifested itself in a history of habitual lying. The jury recommended a death sentence, apparently with at least one juror dissenting, and the court imposed that sentence. On appeal, the defendant argued that the expert's testimony undermined his own, since it suggested that his expression of remorse was insincere. The state appellate court (and later the Fourth Circuit on <u>habeas</u>) rejected the claim, finding that counsel "balanced the evidence and reasonably concluded that [the expert] offered more positive than negative conclusions." That at least one juror was persuaded not to vote for the death penalty helped show that the strategy was reasonable. The difference between <u>White</u> and this case could not be more striking. There, counsel balanced competing considerations and pursued a strategy designed to advance his client's cause; here, there was no strategy at all.

9

## CONCLUSION

Mr. Parse's trial lawyers were deficient when they failed to alert the Court to information in their possession suggesting that Juror No. 1 might be a suspended New York attorney. Their "tragic misjudgment" resulted in the continued "presence [on the jury] of . . . a tainted juror, who could not appreciate the meaning of an oath." (Op. 47). Particularly because the evidence against Mr. Parse was so thin (especially in comparison to that against his co-defendants who have won new trials), Mr. Parse's motion for a new trial based on ineffective assistance of counsel should be granted.

Dated: New York, New York
      September 14, 2012

Respectfully submitted,

/s/ Paul Shechtman
Paul Shechtman
ZUCKERMAN SPAEDER LLP
1185 Avenue of the Americas, 31st Floor
New York, NY 10036
(212) 704-9600
pshechtman@zuckerman.com

Attorneys for Defendant David Parse