CAC3PARC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              09 CR 581 (WHP)

5    DAVID K. PARSE,

6              Defendant.

7    ------------------------------x

8                                             New York, N.Y.
                                              October 12, 2012
9                                             3:00 p.m.

10

     Before:
11
                     HON. WILLIAM H. PAULEY III,
12
                                              District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     STANLEY J. OKULA
17   NANETTE DAVIS
          Assistant United States Attorneys
18
     ZUCKERMAN SPAEDER
19        Attorneys for Defendant
     PAUL SHECHTMAN
20

21

22

23

24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CAC3PARC

| 1 | (In open court) |
|---|---|
| 2 | THE DEPUTY CLERK:  Case of United States of America v. |
| 3 | David Parse.  Appearances for the government? |
| 4 | MS. DAVIS:  Good afternoon, your Honor.  Nanette Davis |
| 5 | and Stanley J. Okula, Jr. for the government. |
| 6 | THE COURT:  Good afternoon, Ms. Davis. |
| 7 | MR. SHECHTMAN:  Paul Shechtman for Mr. Parse.  Ali |
| 8 | Feingold who is a paralegal who has worked on this matter is |
| 9 | with me, and obviously Mr. Parse is here. |
| 10 | THE COURT:  Good afternoon, Mr. Shechtman.  And I note |
| 11 | the presence of Mr. Parse at counsel table. |
| 12 | This is oral argument on the defendant Parse's motion |
| 13 | for a new trial.  Do you wish to be heard, Mr. Shechtman? |
| 14 | MR. SHECHTMAN:  I do, your Honor.  As your Honor now |
| 15 | knows and from the papers, there is only one issue here which |
| 16 | is a question of ineffective assistance of counsel. |
| 17 | THE COURT:  If you can just pull the mike a little |
| 18 | closer.  It has been a long week. |
| 19 | MR. SHECHTMAN:  I understand.  I think for all of us. |
| 20 | Justice O'Connor once said that Strickland was the |
| 21 | most cited case that she ever wrote, and I say that because I |
| 22 | assume the Court is quite familiar with it and the legal |
| 23 | standard.  And obviously the standard is two part. |
| 24 | I would like to think though, I may be proven wrong, |
| 25 | that if we get to prejudice, we should prevail.  But we can |

CAC3PARC

1    have that discussion.

2          The first question obviously is was the performance

3    deficient here.  And that I think turns on the question of did

4    the Brune firm make a strategic judgment on that fateful

5    May 12, 2011 day, maybe even earlier during the voir dire

6    itself.  And I'm not sure there is a great definition of

7    strategic judgment, but there is very good language in Justice

8    Stevens' dissent, but I don't think the majority disagreed with

9    it, that talks about a conscious choice between two

10   alternatives borne of deliberation not happenstance,

11   inattention or neglect.

12         The Second Circuit has told us that it is not a

13   strategic judgment when what is going on is oversight or

14   carelessness or ineptitude.

15         I like to think about this as strategic judgments are

16   situations where lawyers say, one of two courses could have

17   answered my client's interests.  I choose A after some thought.

18   It may be that B is the wiser course.  But we'd retry a lot of

19   cases if we second guess lawyers in that situation and

20   obviously the Supreme Court says we shouldn't.

21         I say in our papers that if what went on here was one

22   of two things.  If the Brune firm in that plaza conversation

23   said the equivalent of let's sandbag the Court, let's go

24   forward.  We know this information and we get a free bite at

25   the apple.  It's hard to think that's not a strategic decision,

CAC3PARC

1   and that of course is very similar to the <u>Chappee</u> case in the

2   First Circuit.  Justice Stevens talks about it being a

3   legitimate decision, but even an unethical one like sandbagging

4   I think is going to turn out to bind the client.

5          The other way this could be a strategic decision, if

6   what they said to themselves, let's sandbag, but more, look,

7   she is a pro-defense juror given what we know about this

8   checkered history, let's keep her on because we're likely to

9   get an acquittal now.  That's the government's view here.

10  That's what they've advanced in their papers.  And I think

11  that's not at all what happened in this case.

12         I think the testimony, and the Court referred to the

13  testimony and said the facts were largely undisputed.  That

14  doesn't mean the inferences from them were ones that all sides

15  were ready to adopt.  But I don't think the core facts were

16  much in dispute at the hearing.  And what happened here,

17  particularly on that day of May the 12th, is that Ms. I will

18  say Theresa because I have trouble with her last name, I

19  apologize, had real second thoughts when she thought about that

20  juror note and the legal words in it.  She then sent paralegals

21  to work -- as your Honor knows, the one thing about the Brune

22  firm is they had an army of them.  And she got information

23  back, and her e-mail said something like, Jesus, I think it's

24  her.  And whether that is characterized as fleeting or a belief

25  held longer than that, there is no doubt that she thought it.

CAC3PARC

1          What's always been odd to me is when she gets to the

2     plaza, how quickly she abandons it.  And whether it is because

3     she's exhausted at the end of a long trial, whether it's

4     because, as she said, she looked more at this report and she

5     thought it was more complicated, whether it was because her

6     seniors cowed her.  But, as your Honor says, the discussion

7     there was superficial and never addressed the information that

8     she had accumulated over the last 12 hours.  And she simply

9     goes along.  And she goes along with her two seniors who don't

10    know of the Westlaw report, but say to themselves it can't be

11    her.  There is no need to tell the judge.  Let's go home, it's

12    been a long day, a long trial.

13         Now, we differed back at the time as to whether that

14    was a waiver or not.  But there is no doubt that that is not a

15    judgment that a lawyer should have made in that situation.

16    Your Honor referred to it as a tragic misjudgment, and it was.

17         One of two things should have happened.  There should

18    have been an investigation, or there should have been someone

19    saying, why me investigate?  Let's just tell the Court and

20    we'll go from there.  And neither of those things happened.

21    Instead, people went home, they spoke to their colleagues a day

22    or two later, and said, geez, she has the same name, but it

23    can't be her.  And nobody said, well, let's do the easy thing

24    and let's tell the Court.  As your Honor says, a few days

25    later, we substituted a new juror and nobody thinks to

CAC3PARC

1    themselves we could just tell the judge.

2           Strickland talks about counsel has a duty to make

3    reasonable investigations or make a reasonable decision that

4    makes particular investigation unnecessary.  And if ever there

5    was a reason either to investigate more, to unleash the

6    Nardello firm, or, I say this respectfully, unleash the Court.

7    Because as crazy as this woman was, I've always thought if your

8    Honor brought her out and said are you the same person, I'm not

9    sure her lying would have gone that far.  You may disagree with

10   me on that, but I think she would have had trouble there.

11          But nobody does it.  And nobody does it not because

12   they were playing a strategic game that they were out to

13   sandbag a court or they were out to get an acquittal.  They

14   didn't do it because, to use the Second Circuit's word, it was

15   an oversight, it was careless, it was inept.  And if I'm right

16   about that, then I think one has met the first prong here, and

17   then the question becomes prejudice.

18          And I can talk more, your Honor, the government

19   doesn't argue sandbagging.  I can talk more about why I think

20   this wasn't -- look, I've read the Court's opinion, I think

21   only seven times.  And I know that the Court at the end of it

22   talks about gambling.  But, I don't think the Court is making

23   findings in that opinion that there was a great strategy going

24   on in that court.  I think your Honor's findings are that these

25   people really dropped the ball, and they failed to do what they

CAC3PARC

1   should have done as lawyers.  And then after that, I've always

2   thought, partly because they dropped the ball, they were less

3   than candid in what they said to the Court going forward.

4           THE COURT:  That last point is really another part of

5   the analysis, isn't it, that, why shouldn't this Court view

6   Brune & Richard's lack of candor with the Court in making their

7   motion as circumstantial evidence that they were in fact trying

8   to conceal from the Court a strategic decision they made?

9           MR. SHECHTMAN:  Look, I think, and the Court does in

10  its opinion consider it as circumstantial evidence and it's not

11  a pretty picture.  But the question to me has always been what

12  is it circumstantial evidence of?  And I think it is

13  circumstantial evidence of a realization that they had a

14  responsibility to tell the Court, and they walked away that

15  night and really left the Court in an untenable position such

16  that at least two, and I hope three, defendants may be on trial

17  again in the spring.

18          So, I don't have any doubt that you can take that

19  conduct and look back.  The question is, do you look back and

20  say to yourself, these are people who knew they dropped the

21  ball and were careless and inattentive and didn't fulfill their

22  obligations to the Court?  Or do you go back and say these are

23  people who made a strategic decision to game the system at an

24  earlier time.  I don't think there is any evidence to support

25  that.  As I've said before, there is nothing in that plaza

CAC3PARC

1   conversation --

2           THE COURT:  I'm really thinking about beyond the plaza

3   conversation, at the time a month and a half later when they

4   filed their motion, they failed to disclose to the Court what

5   they knew and when they knew it.  And a series of proceedings

6   then occur, essentially initiated by both the Court and the

7   government to find out what they knew and when they knew it.

8   And their statements in their memorandum to the Court on their

9   motion that they knew were wrong or misleading at the time that

10  they made them to me.

11          MR. SHECHTMAN:  You're not going to get much argument

12  from me on the point.  The Court has a sort of lovely phrase in

13  the opinion about disclosure by iteration or something like

14  that.  There is no doubt when you go from the telephone

15  conversation to the document itself, and then to and not

16  wanting further discovery, wanting your Honor to somehow

17  address a preliminary issue and issues of privilege.  Your

18  Honor knows I got in this case late and the first thing I did

19  was to say, what are we kidding ourself?  We are going to turn

20  over those documents to the Court because worse comes to worst,

21  the Court is going to look at them in camera.  And if it is

22  going to look at them in camera, it is going to look at them, I

23  don't know you can say out of camera, but it's going to look at

24  them.  This is not a game.

25          I think what happened, though, is lawyers said to

CAC3PARC

1   themselves we failed the Court.  I have said to myself a

2   hundred times, it is so easy the next morning or even that

3   afternoon to walk back in and say to the judge, Judge, we

4   think -- we don't really believe this, for a variety of

5   reasons, but you should know the following.  That she has the

6   same name, there is other information here, and whatever your

7   Honor wants to do with it, we don't think it's her, but we

8   would be foolish if we didn't bring this to your attention.

9        I think what happened to the Brune firm was after this

10   revelation, they said to themselves oh God, we really did drop

11   the ball.  But dropping the ball is ineffectiveness.  Dropping

12   the ball to me is not strategy.

13        Look, if your Honor looks at that conduct, and I know,

14   and I say this respectfully, I know how much that conduct eats

15   at the Court because it's wrong, and the result of it is a very

16   long trial in this courtroom has to be done again.  But, I also

17   don't think that one looks at it and says ah-ha, there was a

18   strategy going on.

19        I think the lawyers thought to themselves that the

20   Court is going to be very disappointed in us if it realizes

21   that we didn't come forward.  Right.  If it realizes we took

22   for an answer it can't be her, when investigation or telling

23   the Court was the better course.

24        If the Court concludes that that conduct is so

25   egregious that circumstantially it proves strategy, I'm not

1    going to win.  We're going to have a sentencing in January and

2    not a trial in the spring.  But I don't think you can read that

3    much into it, and I don't think that in fairness to Mr. Parse

4    the record supports that.  But I understand your Honor's views

5    of the matter.  I can't say more.

6              THE COURT:  Other than the alleged deficiencies by the

7    Brune firm regarding Juror No. 1, was Parse's counsel otherwise

8    constitutionally effective?

9              MR. SHECHTMAN:  Look, I've never read a trial record

10    where I didn't say I wish they would have preserved that issue,

11    I wish they would have made that argument, I think that

12    cross-examination could have been stronger.  I came away from

13    that trial thinking, boy, that Barry Berke is a great

14    cross-examiner.

15              If you asked me was it constitutionally adequate, you

16    bet.  It was very solid defense by a group of very good

17    lawyers.  So, that one's easy for me.

18              THE COURT:  Can you think of any circumstance where a

19    Court could find both a waiver to an impartial jury and

20    effective assistance of counsel?

21              MR. SHECHTMAN:  Yes.  I think.  The simplest one is if

22    it really was a strategic decision, take the most blatant case,

23    the lawyer said to themselves free bite at the apple, don't

24    tell the judge.  If we get an acquittal the great thing about

25    the double jeopardy clause is it's over.  That is a waiver

CAC3PARC

1    under any definition.

2            It's also under <u>Chappee</u> in the First Circuit, and I

3    would bet it is also effective assistance.  Or it's not

4    ineffective assistance, even though one can say that's back

5    alley -- I can't remember the words in <u>Chappee</u>, but they are

6    not very flattering.  Even though you can say those things,

7    it's got to be effective assistance because you're not going to

8    let people get away with that game.  There is a perfect

9    example.

10           You can have, I've done this as a grid, and you can

11   have, if you put waiver and ineffective assistance, you can

12   fill out most of the four boxes.  There is a case in the Second

13   Circuit that I stumbled across which is <u>Flores</u>.  It is old

14   enough there is a Judge Van Graafeiland dissent.  <u>Flores</u> is one

15   where there is a waiver.  The trial lawyer I think says after

16   trial, look, I've come across this 3500 material, this Rosario

17   material, but it wouldn't have helped me very much.  And he

18   says it at a time when it is per se reversible not to have

19   turned over that 3500 material.  There is no harmless error

20   standard, that's how crazy New York law was.  And the First

21   Department in New York Court of Appeals says waiver.  You say

22   right on the record you're not pressing the issue.  The Second

23   Circuit said ineffective assistance, right.  How can a lawyer

24   possibly having been handed a piece of paper which is a new

25   trial card, how can you not play it.  So there is a situation

CAC3PARC

1    where you can have waiver, but ineffective assistance.  And I

2    think it is that that Judge Easterbrook had in mind when he

3    said you have to think about each of these doctrines separately

4    and you can probably have every combination of them.

5              THE COURT:  All right.

6              MR. SHECHTMAN:  Look, on the prejudice prong, I would

7    just say this.  There were acquittals on all but two of these

8    counts.  Mr. Parse is not situated that much differently than

9    Mr. Brubaker, and the proof as it came in didn't come in much

10   differently.  There is a sort of lovely irony here that the

11   government cooperator who the Jenkins lawyer dealt with him was

12   actually a witness, and so, the Kramer Levin firm got to

13   cross-examine him.  And in a sense having him as a cooperator

14   was helpful to their side because they established that their

15   client, like the taxpayers and everyone else, was told

16   repeatedly this is lawful.  What distinguishes these two men is

17   the, quote, backdate.

18             And what I've tried to say in my papers is I think the

19   government was very good at trial in turning this into a

20   backdating case.  I don't think that's what the Deutsche Bank

21   records show.  They are doing these in February and March and

22   putting them on February and March statements and they're

23   putting "as of."  They're then going out to what are very

24   accomplished tax preparers who were getting February, March

25   statements.  And know there was a mistake and are then filing

CAC3PARC

1   tax returns.

2          At the end of the day, the government's brief takes

3   you at great pains through each of those three backdating

4   transactions.  And I should say, quote, backdating

5   transactions.  What you learn is what is undisputed is that's

6   what happened.  Mistakes in the craziness of this law firm

7   where you were churning these things out every December and

8   taking a portion of the losses into income, the tax loss, in

9   the craziness of that and mistakes were made.  And trades were

10  done to try to correct the mistakes.  You can't dispute that.

11         The only question at the end of the day, as I say in

12  the papers, is mens rea.  And the mens rea when you read the

13  government's evidence, the bottom line is he must have known.

14  And he must have known because he was an accountant.

15         And what we know on that is I think for two years, in

16  the '80s, he was a junior accountant at 20 some thousand

17  dollars a year.  There is not a shred of evidence that he ever

18  took a class that taught, quote, the annual accounting rule,

19  and I think the Court knows the Second Circuit precedent that

20  says "must have known" is an argument, but it's not of great

21  weight.

22         And I'll stop with this.  I have to say, I wasn't in

23  the must've known category.  This wasn't something that I was

24  taught in tax law.  Maybe I forgot it and maybe the answer is

25  it's so obvious you didn't have to teach it.  But I said to

CAC3PARC

1    myself the other night, if somebody had said to me, and again I

2    apologize for the example, I won't try to belabor it.  But

3    December 28 in year one if I gave 10,000 shares of IBM to a

4    charity and 10,000 shares to my daughter, right, and I said to

5    my broker just move them into those -- 10,000 to charity,

6    10,000 to my daughter.  And the broker made a mistake.  And

7    here's what makes it so tricky.  The shares to the charity were

8    IBM; the shares to my daughter were Philip Morris.  They

9    reversed it.  The charity calls January 2nd and says we can't

10   take tobacco stock.  We can't accept your gift.  I call the

11   broker, I say what about this.  He says we'll just reverse it.

12   It was our mistake.  We'll send the Philip Morris to your

13   daughter and we'll send the IBM to the charity.  And they

14   reverse it and they put as of December 28 because they reverse

15   it and do it at December 28 prices and it all shows up on the

16   January statement.

17          If I said to Mr. Parse, if I said to me -- the Court

18   may be situated differently, the Court's been educated by this

19   trial.  If I said can I put that tax deduction on my year one

20   return, in that situation, even though it was mistake, it never

21   got accepted, I'd say I don't know, you should ask a tax

22   lawyer.  And that's what Mr. Parse said.  He made the

23   transactions, he made the change, not a single document at

24   Deutsche Bank reflected that this happened other than the as of

25   which was a reflection of what the pricing was.

CAC3PARC

1      I'm sitting here with a tolling agreement from the

2    Southern District in a case of mine which says as of

3    January 14.  Which is faxed on January 16.  But everybody

4    wanted it to be effective two days before because that was the

5    agreement, as happens in the Southern District.  It happens

6    everywhere.  And it doesn't mean backdating.  In this case it

7    means this is the price.

8      But all that is a long way of saying there is no proof

9    that he knew this rule.  There is no proof it was discussed

10   with him.  There is no proof he thought he knew these

11   transactions were wrong.  And at the end of the day, when one's

12   argument is he must've known, that's a weak reed, particularly

13   when this prejudice notion is harmless error like.  After all,

14   you have Justice Marshall's dissent in <u>Strickland</u> that says it

15   should have been harmless error, it should have been under the

16   government's burden.  When you do harmless error analysis, you

17   say two things:  What is the nature of the error, and what's

18   the proof.  The nature of the error here is that a government

19   partisan out to get him in particular was on the jury.  That's

20   a pretty serious error.  The proof, far from overwhelming.

21      As I say, I think if I can get you to the prejudice

22   prong, we ought to see you in April and not in January and I

23   hope that's the case.

24      THE COURT:  Thank you, Mr. Shechtman.

25      Ms. Davis, does the government want to be heard?

CAC3PARC

1        MS. DAVIS:  Yes, please, your Honor.

2        Good afternoon, your Honor.  I'm glad to see that

3   Mr. Shechtman has conceded that other than this particular

4   area, Mr. Parse did in fact receive what can only be described

5   as a platinum plated defense with a defense team that most

6   defendants can only dream of.

7        MR. SHECHTMAN:  I don't think I quite went that far,

8   your Honor.

9        MS. DAVIS:  I do think, though, that had Mr. Shechtman

10   been here at trial and seen the forces that were mustered in

11   Mr. Parse's favor, he would have to admit that it is a rare

12   scene in such a courtroom for an individual defendant.

13        Your Honor, the crux of it is that defendant Parse is

14   seeking to be rewarded now for the strategic choices of his

15   attorney regarding Catherine Conrad and their knowledge of her.

16   Choices for which he has already benefited in the form of

17   acquittals on the conspiracy and the tax evasion counts.  We

18   submit, as we said in our papers, that we believe that

19   Mr. Shechtman has met neither prong of the Strickland standard

20   in that he cannot show ineffective assistance of counsel and he

21   cannot show prejudice.

22        This Court in its ruling on the motion for new trial

23   regarding Catherine Conrad has already found that the Brune &

24   Richard law firm knew that Catherine Conrad and Juror No. 1

25   were the same person and chose to gamble with the jury that

CAC3PARC

1    they had.  Your Honor, that in our view ends the inquiry

2    completely.  That finding alone is sufficient to defeat a

3    finding of ineffective assistance of counsel.

4            The Second Circuit has made very clear, as have other

5    circuits, that you cannot as a defense counsel basically engage

6    in a heads-we-win-tails-you-lose strategy when it comes to your

7    trial conduct.  We know that based on the documentary evidence

8    and the evidence that was adduced at the hearing as well as the

9    evidence that was put forth in the affidavit of Susan Brune,

10   that the Brune & Richard law firm had the suspension opinion

11   prior to voir dire, and chose not bring it to this Court's

12   attention.  As we all know engaged in subsequent investigation

13   regarding Juror No. 1, when Theresa Trzskoma started to have

14   certain doubts about her after the receipt of Juror No. 1's

15   note.

16           It's quite clear that this is not a case where the

17   defense counsel had been given a piece of information and did

18   nothing.  That's quite, quite not what happened here.  In fact,

19   we know that prior to voir dire, they discussed the suspension

20   opinion, they chose not to bring it to the Court's attention.

21   Instead relying simply on the voir dire answers, even though as

22   this Court pointed out, far more trivial issues were aired by

23   all of the parties, by the government and indeed by the Court,

24   in terms of trying to figure out who would be good jurors.

25   They chose not to bring that to the Court's attention then

which I think is very significant.  And it is significant in

part because I think if we can say anything, that we all know

based on the Brune & Richard's defense of Mr. Parse, that if

they had any actual and real concern about a suspended attorney

being on this jury, if they really thought that that was not in

their client's interest, you know, we all know that they would

have brought it to the Court's attention during voir dire.  And

if not at voir dire, then after the results of the Theresa

Trzskoma investigation.

This is absolutely a situation where the Brune &

Richard lawyers, on May 12, after the investigation that they

had, they looked at all the alternatives.  We know because

Laurie Edelstein testified at the hearing, they considered the

three possible alternatives.  They considered whether or not

they should do more investigation, and Susan Brune said no.

They considered whether or not they should bring it to the

Court's attention, and they said no.  So they decided to do

nothing.  And it is that conscious and deliberate choice that

we believe means that they made a strategic choice that cannot

form the basis of ineffective assistance of counsel.

How do we know in the government's view that this

indeed was a tactical choice?  As this Court just pointed out

with regard to the questioning of Mr. Shechtman, they did not

bring that knowledge to the attention of the Court either in

the brief, where they made it appear as if they first learned

1    of this after the receipt of the jury -- of Ms. Conrad's letter

2    to the government in May after the verdict.  And worse, even in

3    the conference calls with the Court, they continued to make it

4    appear and resist the Court and the government learning that

5    knowledge.

6              Mr. Shechtman seems to want to characterize this as

7    them wanting to hide their mistakes.  But it's quite clear, and

8    Susan Brune and Laurie Edelstein testified, we would not have

9    told this Court but for the Court pressing.  That to me speaks

10   of a decision made early on and continuing through the briefing

11   that they wanted the juror on the panel, but they wanted the

12   Court not to know exactly what they knew because they

13   understood, and, as was acknowledged at the hearing, that that

14   was damaging to their client.

15             THE COURT:  Would you address the prejudice prong.

16             MS. DAVIS:  Yes, your Honor.  Your Honor, we believe

17   that there is more than adequate evidence, indeed overwhelming

18   evidence, of defendant Parse's criminal involvement in the

19   corrupt endeavor to obstruct the IRS and in the mail fraud

20   count.  The defense conceded in its papers that Mr. Parse was

21   involved in the backdated transactions.  We think backdated

22   transactions is a perfectly adequate description of them.

23             We also submit, your Honor, that Mr. Parse's

24   background as a CPA, even a non-practicing CPA, is under case

25   law relevant to his intent and circumstantial evidence of his

1    incident.  We know he was instrumental and indeed Carrie Yackee

2    cited to more than a dozen instances during her testimony where

3    she made clear that she was acting at the instructions of and

4    with the knowledge of David Parse in implementing all of these

5    complex and varied transactions that had to be effectuated in

6    order to change the results of the three sets of transactions.

7    It's actually four because Coleman and Blair were two separate

8    taxpayers.  She understood that this was being done for tax

9    purposes.  This is Carrie Yackee the sales assistant.  Nice

10   woman, but not nearly as sophisticated as Mr. Parse.  To

11   suggest that the jury could not find or infer that he knew

12   exactly why these transactions were being effectuated, not for

13   any real investment reason, not because they had figured out

14   that in February and March, the year after the transactions had

15   been done, that somehow it would have been a better investment

16   to have not invested in Cisco stock, but instead to have

17   invested in foreign currency.  To suggest that the jury could

18   not have found that Mr. Parse knew that the reason that these

19   were being done was to effectuate tax losses for the prior year

20   is simply ludicrous.

21          Your Honor, the defendant was faxed information

22   relating to the tax returns themselves.  This wasn't just a

23   one-way street between David Parse's office and Jenkins &

24   Gilchrist, but it was at least a two-way street between

25   Deutsche Bank and Jenkins & Gilchrist and also the accountants.

CAC3PARC

1   So it's quite clear the jury was entitled to infer that he knew

2   that this was being done to change the results of the tax

3   losses.  He also knew, and there is more than a plethora of

4   evidence on this, that each of these tax shelter transactions

5   had to be completed by year end.  And that's why, as Mr. Bair

6   testified and others testified, it was a real effort.

7          Sandra Burnside, you might recall, Mr. Daugerdas'

8   secretary, testified about the avalanche of work that went on

9   in December at the end of the tax years in order to finalize

10  these transactions.  Well, that avalanche of work hit the

11  offices of Mr. Parse's desk.  And as Carrie Yackee testified,

12  Carrie Yackee's desk as well.

13         So to suggest that he was not aware this was being

14  done in order to defraud the IRS as the true results of the

15  transaction we submit is unsupportable.

16         There was a suggestion in Mr. Shechtman's brief, I

17  don't think he touched on it today, but the suggestion was that

18  these transactions, these as of transactions were approved by

19  Deutsche Bank.

20         Well, first of all, Carrie Yackee's testimony here

21  that she was going to Mr. Parse for approval on these

22  transactions.  There is also no evidence to suggest that anyone

23  other than Mr. Parse and Carrie Yackee at Deutsche Bank knew

24  the full picture of what went on, which was that these

25  transactions for these particular taxpayers were tax shelter

CAC3PARC

1    transactions that had to be done by the end of the year, that

2    had been done by the end of the year, pursuant to instructions

3    that had been given by Jenkins & Gilchrist to Deutsche Bank,

4    had been implemented properly by Mr. Parse in the first

5    instance, and now were being requested to redo them to achieve

6    a different result.

7            This I think is a distinction that makes

8    Mr. Shechtman's example of the broker's mistake an apple to our

9    orange or an orange to our apple, which is that this is not an

10   instance where Mr. Parse takes an instruction from a client and

11   screws it up.  Implements it wrong.  Rather, they did

12   everything that they were supposed to do the way it was

13   supposed to be done, and there are results to show for that.

14   It's only because the tax loss that they wanted to get from

15   these results was not correct that it required anything to be

16   done after the end of the year.

17           We suggest that the evidence was overwhelming to

18   support Mr. Parse's knowing and criminal involvement in both

19   the corrupt endeavor to obstruct and impede the IRS and in mail

20   fraud.

21           THE COURT:  Anything further?

22           MS. DAVIS:  Your Honor, there are other pieces of

23   evidence which we've detailed in our briefing but which I will

24   not go through again here.

25           I did want to just note though that the Second Circuit

CAC3PARC

1   has stated that you can find that where there has been a split

2   verdict, as is the case with Mr. Parse, that is evidence of a

3   lack of prejudice.  We had argued in the original motion for

4   new trial and we renew that as well.

5         Finally, your Honor, with regard to the letter of

6   Catherine Conrad to the government which was referenced in the

7   defendant's briefing, she talked about their discussions and

8   deliberations with regard to David Parse.  And interestingly

9   what she also said, which was not mentioned by Mr. Shechtman in

10  his brief, was that that struggle ended when they asked the

11  Court to reread the definitions of wilfully and knowingly.

12  Different states for different counts.

13        MR. SHECHTMAN:  Well, I'll wait.  I apologize to the

14  Court.

15        MS. DAVIS:  And interestingly, their verdict exactly

16  tracked that difference between wilfully, this was required in

17  the conspiracy count and for the tax evasion counts, and

18  knowingly which was really the mens rea relating to other ones.

19  So you might say that they had a struggle.

20        To the extent we can even be considering that letter

21  at all because of Rule 606(b), but I think it's quite clear

22  that they made a deliberate and informed decision about making

23  a distinction drawn on the evidence as apply to the law.  Thank

24  you.

25        THE COURT:  Thank you, Ms. Davis.

CAC3PARC

1          Mr. Shechtman, do you want to be heard further?

2          MR. SHECHTMAN:  I will and I will try to be brief,

3    Judge.  I think really four points.  The government has

4    repeated at the argument here what it said in its brief.  Which

5    was that Mr. Parse benefited from the strategic choice that his

6    clients made and I'll hold the strategic choice point for

7    second.  But I take that to mean that he got acquitted here

8    because she was on the jury.  And that, my father used to say

9    arguments were nonsense on stilts, and that is nonsense on

10   stilts.  I mean, your Honor knows exactly what happened here.

11   There was a partisan in the jury room, a woman who couldn't

12   follow instructions and the like.  Your opinion couldn't be

13   stronger on the point.  And she was fighting the good fight to

14   convict him on 100 percent.

15          So to say we got the benefit of having her on there

16   because we were acquitted isn't worthy, respectfully, of the

17   government.

18          And the related point this was a split verdict, it is

19   a split verdict because she couldn't carry the ball as far as

20   she wanted to, but not because Mr. Parse benefited by her

21   presence.

22          The second thing I'd say is this.  I take it there are

23   two competing visions of what happened here, and at the end of

24   the day, your Honor is going to have to decide.  One is that

25   what happened in that court, your Honor, in the plaza, is that

CAC3PARC

1     what was said was, look, don't be stupid, it can't be her, to

2     do any more would be a waste of the court's time.  That's what

3     I think happened.  That's what I think the record shows.

4          The other is, let's be smart.  She'll be a great juror

5     because she is a suspended lawyer.  Or, let's be smart.  If we

6     leave her on, we get two bites at the apple.  The latter two I

7     think are strategic, but be careful in the following sense.

8     The first one is a choice.  It is a choice to do nothing.  You

9     cannot have a case in which there is not in a sense a choice if

10    it's coming up in an ineffective assistance claim.  I can cite

11    you to Breakiron and Johnson v. Armontrout.  In our brief

12    lawyers are making choices.  In those cases the question is are

13    they informed choices, are they reasonable choices, are they

14    competent choices, are they strategic choices.  And if the

15    choice is don't be stupid, it can't be her, that is not a

16    strategic choice, that is a tragic misjudgment.  Implicit in

17    the word "misjudgment" is that someone's making a choice.  But

18    if it is a tragic misjudgment, I think it's ineffective

19    assistance.

20         The next thing I'd say is this.  We're told that there

21    can't be any doubt that these transactions were effectuated so

22    that there would be tax lawyers and tax losses in the prior

23    year and it's ludicrous to think otherwise.  Of course that's

24    why the transactions were being done.  There is no doubt that's

25    why these transactions were being done in February or March.

CAC3PARC

1   But the real question is, did Mr. Parse know that that was

2   defrauding the government.  Right.

3           Look, the avalanche of work here was in December.  But

4   the question is, if you made a mistake, like in my example, can

5   you undo it.  And you have to appreciate what the government

6   has said to you today.  It has essentially said if it is a

7   broker's mistake, like in my hypothetical, then maybe a

8   reasonable broker could think you could undo it.  But if it is

9   a lawyer's mistake, you can't.  And that's a very different

10  version of the annual accounting rule than I've ever heard

11  before.  Right.  And if my hypothetical is one in which a

12  reasonable broker could think leave it up to the tax lawyers, I

13  am not sure what happened in this case isn't in that same

14  category.

15          We ended up with an argument about the contents of the

16  note and how your Honor should interpret them to show whether

17  there was prejudice here.  All of this began with the

18  government saying to us be careful, Rule 606(b) has its limits.

19  The one thing I know, and the Third Circuit case in Breakiron

20  is quite good on talking about whether one looks at this

21  subjectively or objectively, you can't draw inferences from

22  that juror's note in deciding whether there was prejudice here

23  for two reasons.  One, 606(b) precludes it, and two, that note

24  was written by Catherine Conrad and I still don't think the

25  United States wants to be standing up in a court and saying

CAC3PARC

1   rely on what Catherine Conrad said.

2           THE COURT:  All right.  Counsel, thank you for your

3   arguments on the motion.  Decision reserved.  Have a good

4   afternoon.

5           MS. DAVIS:  Thank you.

6                             o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25