UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                                 :

UNITED STATES OF AMERICA,           :

   - v. -                        :     S3 09 Cr. 581 (WHP)

PAUL DAUGERDAS,              :
DONNA GUERIN,
DENIS FIELD, and              :
DAVID PARSE,

                                 :

             Defendants.

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM
### REGARDING DEFENDANT DAVID PARSE

 

                                                 PREET BHARARA
                                                   United States Attorney for the Southern
                                                 District of New York

STANLEY J. OKULA, JR.,
NANETTE L. DAVIS,
Assistant United States Attorneys

     - Of Counsel -

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  The Defendant's Educational Background and Work History . . . . . . . . . . . . . . . . . . . 3

    B.  The Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.  Parse' Participation in the Fraudulent Kasperzak/Calphalon Tax Shelter . . . . . . . . . 3

        2.  Parse's Personal Tax Evasion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        3.  Parse's Participation in the Fraudulent Backdating of Transactions . . . . . . . . . . . . 5

    C.  The Indictment, Trial, New Trial Rulings, and the PSR . . . . . . . . . . . . . . . . . . . . . . 8

    D.  The Objections to the PSR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    E.  Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.  Sentencing Guidelines Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.  3553(a) Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        1.  The Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . . . . 24

        2.  History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . 25

        3.  The Need To Afford Adequate Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        4.  The Need To Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . . . . . . . 33

        5.  The Appropriate Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :

UNITED STATES OF AMERICA,                      :

  - v. -                                       :          S3 09 Cr. 581 (WHP)

PAUL DAUGERDAS,                                :
DONNA GUERIN,                                  :
DENIS FIELD, and                               :
DAVID PARSE,                                   :
                                               :
           **Defendants.**               :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT DAVID PARSE

      The United States respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant David Parse ("Parse" or "the defendant"), which is scheduled for March 22, 2013.

### Preliminary Statement

      Following an eleven-week trial that included over 1300 exhibits, 41 witnesses, eight days of jury deliberations, and 46 jury notes, the jury on May 24, 2011 convicted David Parse on one count of corruptly obstructing and impeding the due administration of the Internal Revenue Laws in violation of 26 U.S.C. § 7212(a) (Count Twenty of the Redacted S3 Indictment), and one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 2 (Count Twenty-Five of the Redacted S3 Indictment). The jury acquitted Parse of the conspiracy count and three counts of tax evasion. Those convictions stemmed from David Parse's integral role in one of the largest tax fraud schemes ever charged, the details of which are spelled out in the indictment against him, S3 09 Cr. 581 (WHP), and the trial record. Incorporating the factual allegations in the conspiracy count, Count Twenty

charged Parse, Donna Guerin, Denis Field and Craig Brubaker with a wide-ranging corrupt endeavor to obstruct and impede the IRS in connection with the design, marketing, implementation, and defense of four tax shelters known as Short Sale, Short Option, SWAPS, and HOMER. Likewise incorporating the factual allegations of the conspiracy count, Count Twenty-Five charged Parse, along with Paul Daugerdas, Guerin, Field, and Brubaker, with mail fraud as to the overarching scheme to defraud the IRS through the design, marketing, implementation, and defense of the Jenkens & Gilchrist tax shelters.

The proof at trial demonstrated that Parse — an investment representative at Deutsche Bank Alex Brown and certified public accountant — participated as a key actor in the largest criminal tax fraud in history. That fraud, which featured Parse's five-year involvement in four fraudulent tax shelters, resulted in the creation of over $7 billion of fraudulent tax deductions or benefits, $1.6 billion in Guidelines tax loss, and well in excess of $230 million in actual loss to the United States Treasury. Parse's role in the fraud - as one of the principal Deutsche Bank employees who steered bank clients to the J&G tax shelters, established the evanescent brokerage accounts for those shelters, executed the crucial Treasury short sale and options "investments," executed the pivotal transfers between accounts, and who helped facilitate the fashioning of the options and other financial instruments used in the shelters - was indispensable to the shelters' success. Consequently, Parse earned substantial commission income from his role in the tax shelters — over $3 million.

For the reasons spelled out below and in the Probation Department Presentence Investigation Report ("PSR"), we submit that Parse's conduct, and the resulting harm, is deserving of a significant prison sentence.

## I.   RELEVANT FACTS[1]

### A.   Defendant's Educational Background and Work History

Parse obtained his bachelor's degree in business administration from the University of Michigan in 1984 and his Master's degree in business administration from the same school in 1988. PSR ¶¶ 89-90.  Parse also was a licensed stockbroker and investment adviser, and passed various securities and investment adviser exams.  From 1988 to 1995, Parse acted as an investment adviser at Goldman Sachs, Kidder Peabody, and Credit Suisse First Boston.  From 1995 through April 2006, Parse was employed as an investment representative at Deutsche Bank Alex Brown in its Chicago office.  From April 2006 to the present, Parse has been self-employed at his company Union Capital LLC, a financial consulting firm, which is currently dormant.

### B.   The Offense Conduct

The facts concerning Parse's offense conduct will not be repeated herein at length, as those facts are comprehensively set forth in the trial record and the PSR.  Accordingly, we are confident that, as a result of the foregoing and the submissions made by the parties, the Court is thoroughly familiar with the scope and nature of the defendant's criminal conduct.

Several aspects of that offense conduct bear additional discussion.

#### 1.   Parse's Participation in the Fraudulent Kasperzak/Calphalon Tax Shelter

Parse assisted in advising the shareholders of the Calphalon cookware company (primarily members of the Kasperzak family, owners of the company, and several key employees) on the orderly disposition of their shares of Newell stock acquired in a stock swap as a result of the sale of

---

[1]   The facts described in this section are based on the Probation Department's Presentence Report ("PSR"), the trial record, documents that the Government has produced to the defendant in discovery, and Government interviews of various witnesses.

the Calphalon company to Newell. Parse was introduced to Peter Barnhart, Calphalon's Executive Vice-President, Sara Jane Kasperzak, Dean Kasperzak, and other members of the Kasperzak family in 1998. As a result of the work that Parse was doing in helping the Calphalon stockholders dispose of their Newell shares, Parse became aware of the large taxable gains that the stockholders would receive. In a meeting at Parse's office, Parse introduced Peter Barnhart to Paul Daugerdas (then an Altheimer & Gray partner) for the purpose of having Daugerdas pitch a J&G tax shelter to the Calphalon shareholders. Parse subsequently attended a meeting with Daugerdas, the Calphalon shareholders, and several attorneys from the law firm of Shumaker Loop & Kendrick. In that meeting and in Parse's presence, as Dean Kasperzak testified at trial, Daugerdas opened with the red-flag statement that the information that he was about to provide was completely confidential and that the shareholders could not even share it with the shareholders' own investment advisors or accountants. (Tr. 6243). Daugerdas then described the tax shelter which he said would result in the shareholders' paying virtually no taxes on the gains. Kasperzak further testified, "We were told that the profit potential was very low and that going forward, should we choose to go forward, if we were questioned about the matter, that our intent was in fact to make a profit, but in order for this tax shelter to work, there had to be, in effect, a loss to balance off the gains from the stock sale."[2] (Tr. 6244). The urging by Daugerdas for the shareholders to make false statements about their intent is wholly inconsistent with good faith – all of which Parse witnessed.

_____

[2] The testimony of Erwin Mayer and other trial witnesses made clear that the expected short-term duration of the Treasury note transactions, combined with the lack of volatility of the specific Treasury notes chosen for the transactions, meant that the short sale was virtually certain to produce only a small loss or gain on this purported "investment."

### 2.      Parse's Personal Tax Evasion

Parse executed his own fraudulent SOS tax shelter transaction to eliminate the gains he earned in 2000, and received a free fraudulent opinion letter from J&G. The losses Parse created — $3,000,000 — were larger than Parse needed for the 2000 year, suggesting that he intended to eliminate taxes in more than one year. On his 2000 tax return, Parse claimed a $1,278,706 fraudulent loss, evading $517,542 in taxes on over $2.1 million in income. See GX 1001-132 (Parse 2000 Tax Return); GX 1000-52 (IRS Certificate of Assessment and Payments for Parse's 2000 Taxes); GX 54-1 (J&G Opinion Letter for Parse). Parse's receipt of a free opinion letter, which would have otherwise cost him no less than $90,000 (and likely more)[3] had he paid the going rate for a J&G opinion letter, violated Deutsche Bank's gift prohibition policy and almost certainly violated the law, in that it constituted his receipt of an unlawful commission or gift by a bank official. See 18 U.S.C. § 215 (unlawful for any bank employee to accept anything of value intended to be rewarded in connection with business of bank).

### 3.      Parse's Participation in the Fraudulent Backdating of Transactions

As detailed in paragraphs 44-52 of the PSR, Parse's conduct involved not only assisting in the design, marketing, and implementation of the fraudulent J&G tax shelters, but also the implementation of fraudulently backdated when Donna Guerin and others at J&G realized that the shelters had been implemented incorrectly, or not consistent with the clients' wishes with respect to

---

[3]  Parse executed a $3,000,000 short options deal through J&G. Using a conservative 3% fee results in a $90,000 opinion letter value. Parse only deducted just over $1.2 million of the $3,000,000 in losses on his 2000 return, and thus had available just under $1.8 million in losses to use on future tax returns. Although Parse ultimately did not utilize those additional losses (because he reversed his own transaction when the IRS began investigating), the proper view of Parse's own fraudulent transaction should take into account the full amount of fraudulent benefit he produced.

the amount or nature of the tax loss.

The facts concerning all of the backdating will not be repeated at length herein. It is useful to note, however, the following facts as they relate to Parse: (i) Parse was the key to the success of the backdated transactions — without his agreement and participation, the J&G attorneys were powerless to correct the mistakes; (ii) the corrections needed for the Aronoff transactions are reflected in David Parse's own handwriting on GX 401-99 (reflecting the original transaction) and GX 401-100 (reflecting the revised transaction), showing that he fully understood the nature of the backdating; (iii) the correction of the transactions required a complex series of steps, including reversals of transfers of assets between accounts, reversals of already-completed stock and foreign currency transactions, and execution of new "as of" foreign currency and stock trades; and (iv) the backdating occurred with not just one client, but several and occurred in two different tax years — tax year 2000 for the Aronoff family members, and tax year 2001 for Michael Toporek, Greg Blair, and Matthew Coleman.

In his sentencing memorandum, Parse attempts to excuse the backdating by claiming, "He gave no investment advice, and the trades were executed by his assistant." (Parse Sent. Mem. at 12). This statement is not only a shameless attempt by Parse to throw his subordinate under the bus, but also a testament as to just how perverted these tax shelters were that the investment broker, who otherwise touts his treatment of his long-time clients, (id. at 4 "As a broker, David had 30 to 40 long-term customers, and his goal was to assist them to invest their money wisely."), now attempts to make much of the fact that he was not giving investment advice to the backdating clients (or, as the evidence showed, to any of the other tax shelter clients). As to Parse's suggestion that the backdating transactions were done not by Parse, but by Carrie Yackee, his sales assistant (Parse

Sentencing Mem. at 12), the evidence showed and Yackee testified persistently, consistently, and credibly that she acted at all times at the instruction of David Parse. Given the foregoing, Parse's attempt to blame her for his criminal conduct is inconsistent with the facts; it is also, in a larger sense, inexcusable.

To the extent that Parse trial and current counsel have suggested and continue to suggest that the backdating transactions were approved by Deutsche Bank, the only approvals were from Parse himself, and on some of the trade tickets, the signature of the branch manager appears.[4]  Moreover, there is no evidence that the branch manager knew of the purpose and animus for the backdated transactions.  To the extent that a branch manager actually knew what was occurring, that fact would only render the branch manager a co-conspirator, and not excuse Parse's criminal conduct.

However complex the tax shelters, the fraudulent backdating was nothing more than garden-variety fraud committed to achieve impermissible tax results.  Basic principles of tax reporting — such as the annual accounting rule — prohibit the changing of tax results through transactions carried out after the close of the tax year.  Carrie Yackee testified that she understood, based on her

---

[4]  Yackee made clear that the "Deutsche Bank approvals" on the backdated transaction were actually instructions from David Parse:

> Q. You also testified about acting in accordance with Deutsche Bank policy, correct?
> A. Correct.
> Q. Are you aware what Deutsche Bank's policy is for the use of  as of dates on trades?
> A. I don't know of the specific policy.
> Q. How do you know you acted in accordance with the policy?
> A. I was directed what to do by my boss.
> Q. So when you say you acted in accordance with policy, you mean you followed your boss's orders?
> A. And I presumed that he would follow policy. So . . .

(Tr. 5699).

conversations with David Parse, that the steps of the transactions had to be completed by the end of the year to achieve the tax benefits. Given this clear legal imperative, Parse's willingness to participate in such conduct can only be viewed as brazen misconduct.

### C.      The Indictment, Trial, New Trial Rulings, and the PSR

On March 4, 2010, the grand jury returned a third superseding Indictment charging Parse, Guerin, Daugerdas, Mayer, and Brubaker in thirty-one counts. Parse in particular was charged with a conspiracy to the defraud the IRS, to commit tax evasion, and to commit mail and wire fraud (Count One), as well as three counts of tax evasion relating to the tax shelter transactions of three separate tax shelter clients (Counts Seventeen, Eighteen, and Nineteen). Parse was also charged in Counts Twenty and Twenty-Five with engaging in a corrupt endeavor to obstruct and impede the IRS and mail fraud, respectively, essentially through the same conduct underlying the Count One conspiracy charge.

On February 28, 2011, trial commenced against Parse and his co-defendants. On May 24, 2011, the jury found Parse guilty on Counts Twenty and Twenty-Five, and not guilty on Count One and Counts Seventeen through Nineteen. Subsequently, the Court denied Parse motions for new trial based on juror misconduct and ineffective assistance of counsel. As a result of Parse's convictions, he faces a maximum of 23 years in prison.

In connection with Parse's sentencing, the Probation Office has prepared a Presentence Investigation Report (the "PSR"), which calculates the defendant's Sentencing Guidelines offense levels. As calculated by Probation, the final offense level is 40, calling for a Sentencing Guidelines sentence at the statutory maximum, 23 years' imprisonment. PSR ¶ 103. The breakdown of Parse's Guidelines calculation is as follows:

8

- A base offense level of 36 pursuant to §§ 2T1.9, 2T1.1, and 2T4.1(tax table). PSR ¶ 62.

- An increase of 2 levels pursuant to U.S.S.G. § 2T1.1(b)(2) because the offense involved sophisticated means. PSR ¶ 63.

- An increase of 2 levels pursuant to U.S.S.G. § 3B1.3 because the defendant used his skills as a broker and CPA to materially facilitate his design and implementation of the highly-complex financial products that were involved in the different tax shelters. PSR ¶ 64.

Parse has no criminal history points. Thus, with a final offense level of 40, Parse's Guidelines analysis, according to the PSR, yields a final advisory Guidelines range of 292-365 months. However, due to the combined statutory maxima of Counts Twenty and Twenty-Five, the Guidelines term of imprisonment is limited to 276 months. PSR ¶ 103.

### D.   The Objections to the PSR

Parse has leveled three objections to the calculation of the Guidelines: specifically, to (i) the loss calculations for Guidelines purposes; (ii) the application of the sophisticated means enhancement, and (iii) the application of the use of a special skill. Parse objects to being held responsible, for Guidelines loss calculations purposes, for the full amount of loss generated by the corrupt endeavor and scheme to defraud the Internal Revenue Service. Parse argues that "a fair reading of the jury's verdict is that Parse was convicted only for his role in what the [Presentence] Report describes as three instances of fraudulent 'backdating.'"

Defendant Parse's position is contrary to law and has no basis in reliable fact. First, Parse's contention that he is being held responsible for acquitted conduct ignores the fact that he was convicted on the broad corrupt endeavor and scheme to defraud. Indeed, the Second Circuit Court of Appeals has held as follows:

Under § 1B1.3(a), the court, in calculating a defendant's offense level, was to take

9

into account, inter alia, the defendant's own acts and omissions, see id. §
1B1.3(a)(1)(A), as well as "all reasonably foreseeable acts and omissions of others
in furtherance of the jointly undertaken criminal activity," id. § 1B1.3(a)(1)(B), and
"all harm that resulted from the acts and omissions specified in subsection[ ] (a) (1)
. . . above, and all harm that was the object of such acts and omissions," id. §
1B1.3(a)(3) (emphasis added).

United States v. Reifler, 446 F.3d 65, 108 (2d Cir. 2006) (alterations in original). See also United

States v. Nash, 338 Fed. Appx. 96, 98, 2009 WL 2901565, at *1 (2d Cir. 2009) (summary order)

(rejecting defendant's claim that he be held liable only for the fraudulent transactions in which he

was directly involved; loss should be based on foreseeable loss from fraudulent scheme); United

States v. Singh, 390 F.3d 168, 192 (2d Cir. 2004) (court upheld finding of full loss for sentencing

guidelines purposes, despite some acquittals: "It matters not that various phases of the execution of

the scheme were rejected by the jury for reason or reasons unknown. Singh's opinions regarding the

legality of his billing practices were rejected by the jury, which clearly found the existence of an

overall fraudulent scheme."); United States v. Zichittello, 208 F.3d 72 (2d Cir. 2000) (upholding loss

computations in RICO case: "As to the campaign finance scheme, Hartman is liable as a

co-conspirator for 'all reasonably foreseeable acts and omissions' in furtherance of the conspiracy.

U.S.S.G. § 1B1.3(a)(1)(B).  Because there was evidence that Hartman was well aware of the larger

scheme, the district court did not err in finding that Hartman was liable for the entire loss suffered

by the NYCCFB."); United States v. Senninger, 429 Fed. Appx. 762, 767, 2011 WL 2688988, at *4

(10th Cir. 2011) (summary order) (court upheld attributing full loss from mail fraud scheme to

defraud the IRS and Colorado Department of Revenue; "[T]he court looked at the totality of

Senninger's involvement in that scheme, concluding her actions did not involve 'simply filling in

blanks on amended returns.'  The district court found Senninger 'len[t] credibility to the entire

operation. She lent her credibility as having been an IRS auditor to this operation, and she knew she

was doing that when she gave the credentials to [her co-defendant].").

Thus, the proper view of Parse for purposes of sentencing guidelines and sentencing more broadly is to look at the scheme and corrupt endeavor in which Parse was charged and convicted, of which the fraudulent backdating was only a part. Parse was convicted for his unlawful, willful, and knowing participation in a long-standing scheme to defraud the IRS through the design, marketing, and implementation of the Short Sale, SOS, HOMER and Swaps fraudulent tax shelter transactions. The evidence showed that Parse was involved in the creation of the structure of options used in the SOS, HOMER and Swaps tax shelters and the approval of the means by which Deutsche Bank executed the options. Parse was central and indispensable to the execution of hundreds of tax shelter transactions involved in the scheme to defraud. He had direct and substantial involvement in speaking with many tax shelter clients about the options used in their particular tax shelters. He told a number of tax shelter clients that it did not matter what currency they chose to use in the tax shelter, showing that Parse was well aware that the investment component of the tax shelter was not being done for true investment purposes, but rather as necessary window dressing for the tax shelter. He also advocated the trading in so-called "dog tech stocks" as additional window dressing for the tax shelters.[5]

Parse was present at a meeting where co-defendant Paul Daugerdas advised the prospective tax shelters clients (the shareholders of Calphalon cookware company) that although the profit

_____

[5] "Dog tech stocks," or "fallen angels," were technology stock from the period 1999-2000 that had lost significant value. Purchase of those stocks by tax shelter clients — as advised by Parse and others — were designed to disguise the tax shelter losses because an IRS auditor looking at the huge losses attributable to the disposition of those shares on tax returns might be led to conclude that the losses stemmed from genuine trading losses in shares that happened to fall in value, rather than shares to which fraudulently inflated basis had attached. (Tr. 2363).

potential of the investment was very low, going forward the clients should say if questioned about the matter that their intent was to make a profit. (Testimony of D. Kasperzak, Tr. 6244:16-21). This vignette provides a window onto the larger involvement by Parse in steering hundreds of clients into purported "investments" that were no more than necessary appendages of nominal financial transactions to exclusively tax-driven products. Stated differently, the facts overwhelmingly demonstrated that Parse knew that the clients were pursuing the options or Treasury shorts and swaps not because they wished to undertake true investments but, rather, because they wanted tax losses. Paul Shanbrom testified that Parse told him that Deutsche Bank could move the market so that the so-called sweet spot in the SOS shelter would never be hit.

All of this evidence is in addition to the evidence of Parse's participation in the backdated transactions. A full and fair view of the evidence shows that Parse was deeply and fully involved in the entire corrupt endeavor and scheme to defraud the IRS. And without Parse at the helm of the investment sales, purchases, and transfers through Deutsche Bank, a substantial number of the fraudulent Short Sale, SOS, and Swaps transactions would not have occurred (including all of the BDO transactions), and *none* of the fraudulent HOMER transactions would have occurred. Thus, the law requires that Parse be held accountable for the full amount of loss caused by the scheme to defraud, in this case, more than $1.6 billion.

Parse urges the Court to ignore the facts and the law by pointing to the letter of Juror No. 1, Catherine Conrad, to AUSA Stan Okula on May 25, 2011. (Docket Entry 461, Decl. Exh. 3). In that letter, Juror Conrad advised that the "backdating was enough for the other charges [other than the conspiracy." First of all, Conrad's lies during voir dire resulted in the reversal of the convictions of Daugerdas, Guerin, and Field, and her utter lack of credibility was well-documented by the Court

in its decision granting the motion for new trial.  6/4/12 Ord. Granting Mot. for New Trial at ("Conrad's sweeping dishonesty demonstrates that she is incapable of weighing evidence, measuring credibility, and applying the law as instructed by this Court.").  In the Memorandum in Support of the Defendants' Motion for New Trial, written by Parse's trial counsel, his lawyers identified the many lies that Conrad told the Court, and stated among other things, "Conrad's failure to respond truthfully to many of the Court's questions obstructed the voir dire process and resulted in Conrad being seated as a juror despite her psychological impairment and bias, thereby depriving defendants of their right to a fair trial." (Docket Entry 460 at 7-8).  And yet now, at sentencing, Parse points to this very same "monstrous liar" as someone whose remarks about the verdict as to Parse should guide the Court's determination of the Guidelines loss computations.  As the litigation over the new trial motion showed, there is simply no basis whatsoever to credit Juror No. 1's observations about anything.  Even if the Court were to treat those observations as true and credible , it appears from the context that Conrad's statement that "[t]he backdating was enough for other charges" spoke only to her own views, and not those of the entire jury.

More generally, as the Seventh Circuit has observed, "We do not pretend to know a great deal about the mental processes of jurors. Since jurors are not required to explain their reasoning, since their deliberations are confidential, and since their lack of legal training and experience makes it difficult for a judge to think his way into their minds, the attempt by judges to evaluate the impact of specific instructions on a jury's verdict is speculative and quite likely to be mistaken." Needham v. White Laboratories, Inc., 847 F.2d 355, 360 (7th Cir. 1988); see also United States v. Powell, 469 U.S. 57, 68-69 (1984) (reluctance to inquire into inner workings of jury insulates arguably inconsistent verdicts from appellate review). As Judge Marrero aptly noted in United States v.

Santiago, 413 F. Supp. 2d 307, 319-20 (S.D.N.Y. 2006):

> Nor is a court's weighing of that aspect of a defendant's conduct [possession of a firearm] in deciding an appropriate sentence for the crime of conviction, where the judge has heard at the trial and can thus assess the sufficiency of the evidence, much different from its consideration, as courts traditionally have done, of other forms of aggravating circumstances presented in the presentencing reports.

> As the Supreme Court noted in Watts, it is impossible to know exactly why a jury found a defendant not guilty of a certain charge, and accordingly "the jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty." 519 U.S. at 155, 117 S.Ct. 633. Therefore, " '[a]n acquittal is not a finding of any fact.' " Id. (quoting United States v. Putra, 78 F.3d 1386, 1394 (9th Cir.1996) (Wallace, C.J., dissenting)).

Indeed, this Court, during jury deliberations, declined defense counsel's suggestion that the Court's response to a jury note during deliberations should reflect in part a speculation about the current state of the jury's deliberations:

> MR. BERKE: I would suggest, Judge, if you give that and the jury still needs further guidance, they can come back. But to definitively answer "yes" [to the jury's question of whether "you could be guilty of Count Twenty and not guilty of Count One?"] the jury could I believe would be incorrect given that we don't know what their factual determinations are, and potentially very prejudicial given where we are in the deliberations and the nature of the charges here.

> THE COURT: I decline to speculate about where the jury is in its deliberations or to interject myself into the reasoning or thinking of the jury that may have precipitated the note. The question posed in the note is a very simple and direct question. I intend to answer that question in a very simple, direct, and forthright manner. Clearly the answer to that question is yes, and I intend to tell the jury that, but to then tell them that each count must be decided individually as to each defendant and it's for you, the jury, as the finders of the facts in this case, to determine whether or not the government has proven each element of each offense against each defendant beyond a reasonable doubt.

(Tr. 9125). Parse's contention that the Guidelines loss should be based only on the backdating would improperly substitute rank speculation for the evidence at trial regarding his larger and more extensive involvement in the scheme to defraud, and ignores the fact that Parse was charged with

14

and convicted of his participation in the entire mail fraud and IRS obstruction scheme.

In addition, even if this Court should view Parse as having been convicted only of a small portion of the scheme to defraud, and although Parse was acquitted of the conspiracy and tax evasion counts, "when determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal." United States v. Reese, 33 F.3d 166, 174 (2d Cir.1994) ("[The judge] was entitled to rely on the dollar amounts as summarized by the government in the absence of an indication that the numbers were incorrect. [The government investigator] testified that the information contained in the exhibit was derived from his investigation."). The Second Circuit has made clear that a sentencing court must:

> consider all facts relevant to sentencing it determines to have been established by a preponderance of the evidence as it did pre-Booker, even those relating to acquitted conduct, consistent with its statutory obligation to consider the Guidelines. 18 U.S.C. § 3553(a)(4), (5). We restate, however, that while district courts may take into account acquitted conduct in calculating a defendant's Guidelines range, they are not required to do so. Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence.

United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (citations omitted). See also United States v. Watts, 519 U.S. 148, 157 (1997) (at sentencing, even "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge").

In sum, there is no basis to ignore the weight of the evidence of Parse's substantial involvement in the scheme to defraud in favor of an attempt to go behind the jury's verdict supported by nothing more than surmisal and reference to a juror whose credibility has been thoroughly destroyed. Thus, this Court is require to — and should — consider all of Parse's conduct in

15

determining his sentence.

Second, Parse objects to a sophisticated means enhancement, per U.S.S.G. § 2T1.1(b)(2) . In tax offenses, the Sentencing Guidelines apply a two-level enhancement when "[t]he offense involved sophisticated means . . . ." U.S.S.G. § 2T1.1(b)(2); see also 2T1.1 Application Note 4 ("'[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  Conduct such as hiding assets or transaction, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."). In United States v. Lewis, 93 F.3d 1075 , 1084 (2d Cir. 1996), the Second Circuit made clear that the "sophisticated means" enhancement relating to tax offenses is "an offense characteristic, not a characteristic of the individual defendant." (internal quotation marks omitted).  This assertion rested in part on the government's vital interest in collecting taxes and the consequent need for a strong deterrent to the use of sophisticated tax fraud schemes that would make detection difficult and thus interfere with the process of tax collection. Id.  The importance of tax collection seemingly outweighed the arguable unfairness of imposing a sizable sentencing enhancement by reason of circumstances of which a defendant is unaware.  In the instant case, the offense included the creation of highly complex and murky, multi-step tax shelters whose very design was aimed at "hiding the ball" from the Internal Revenue Service.  The structures of the tax shelters, with which Parse was intimately familiar, required the creation and use of multiple entities, including partnerships, S corporations and limited liability corporations.  The execution of the tax shelters' many steps required complex paperwork that required teams of attorneys to complete and specialized paperwork and account statement entries at Deutsche Bank. For these reasons, the application of a sophisticated means enhancement is warranted.  See United

16

States v. Kontny, 238 F.3d 815, 821 (7th Cir. 2001) ("[W]e think 'sophistication' must refer not to the elegance, the 'class,' the 'style' of the defrauder—the degree to which he approximates Cary Grant—but to the presence of efforts at concealment that go beyond (not necessarily far beyond, for it is only a two-level enhancement that is at issue, which in this case added roughly six months to the defendants' sentences) the concealment inherent in tax fraud.").

Third, Parse objects to an enhancement for the use of special skills, per U.S.S.G. § 3B1.3. The Sentencing Guidelines apply a two-level enhancement in cases where a defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. . . ." U.S.S.G. § 3B1.3. Application Note 4 to § 3B1.3 states, "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." The Second Circuit has held,

> In general, for § 3B1.3 to apply, the government must establish: (1) that the defendant possessed a special skill or occupied a position of trust, and (2) that he or she used this skill or position "in a manner to significantly facilitate" the offense of conviction. United States v. Gandy, 36 F.3d 912, 915 (10th Cir.1994) (observing that § 3B1.3 applies where the defendant: (1) possessed a special skill; and (2) used that special skill to facilitate significantly-i.e., make easier-the commission or concealment of the offense); accord United States v. Hirsch, 239 F.3d 221, 226-28 (2d Cir. 2001).

United States v. Downing, 297 F.3d 52, 64 (2d Cir. 2002) (holding that § 3B1.3 enhancement can apply to inchoate crimes if "the court determines with reasonable certainty that the defendant actually intended to use his or her special skill or position of trust to facilitate or conceal significantly the corresponding substantive offense."). In Downing, the conspiracy required the furnishing of unaudited financial reports for companies to be used in a "pump-and-dump" securities fraud scheme;

17

the conspirators located accountant Ward who recruited his employee accountant Drucker to create the bogus reports. The Second Circuit upheld the two-level enhancement for Drucker's agreed-upon use of his accounting skills which he intended to utilize, but did not in fact utilize, to produce the unaudited financial reports, because Ward and Drucker "plainly intended to use their accounting skills 'in a manner that [would have] significantly facilitated the commission or concealment of the offense.'" Downing, 297 F.3d at 65 (alteration in original). See also United States v. Keiser, 578 F.3d 897, 907 (8th Cir. 2009) ("Keiser's 'training and experience' [as a commodities broker] and 'understanding of the intricacies' involved in the scheme facilitated his solicitation of victims and commission of the fraud. Indeed, some of the investors solicited by Keiser were familiar with Keiser as a result of his work as a commodities broker. The district court did not clearly err in applying the § 3B1.3 enhancement.).

In the instant case, Parse directly and substantially utilized his special skill as a broker and a former CPA to implement the fraudulent options and short sale investments used in the tax shelters and to effectuate the backdated transactions to correct the incorrectly-implemented tax shelters. The backdated transactions required a complicated set of foreign currency and stock sales and purchases and journal transfers to undo the results of prior purchases and sales and to achieve the desired level of tax loss. In addition, Parse's recommendations of various "dog tech stocks" to window dress the tax shelters required use of his special skills as a stockbroker. Parse's position as a broker while at Deutsche Bank Alex Brown also necessitated special stockbroker licensing and training. The enhancement is thus appropriate.

Parse also objects to a number of non-Guidelines issues. First, Parse objects to the description that Parse designed and marketed the fraudulent tax shelters, claiming he did not help

design them, and only marketed to one client.  However, the evidence at trial showed that David Parse was instrumental in facilitating the fashioning and approval of the digital options for the SOS shelters and related paperwork within Deutsche Bank, and participated in the discussions of the design of the HOMER barrier options and assisting in the implementation paperwork for the HOMER tax shelter.  Moreover, numerous clients testified at trial that, prior to their purchase and execution of the various tax shelters, the clients had a conversation with David Parse who explained the nature of the particular investment.  (E.g., Tr. 5709 (William Saunders); 2093 (John Martin)). In addition, Parse was instrumental in convincing members of the Kasperzak/Calphalon group to enter into several different types of Jenkens & Gilchrist ("J&G") tax shelters.

Parse also objects to Paragraph 53's inclusion of the figure of $3,000,000 as the income Parse earned from the scheme to defraud.    At trial, Parse's counsel Susan Brune introduced four exhibits reflecting the commissions David Parse earned during 1998 through 2001.  See DX 5835-5838 (attached as Exhibits A through D).  The commissions reflected in each year's spreadsheet (broken down a month per page) show the various categories of commissions by description.  It is apparent from a review of the spreadsheets that the Short Sale commissions are reflected in the "Government" category, which reflects the fact that the pertinent investment in the Short Sale tax shelters was the short sale of Government Treasury notes.  The evidence at trial showed that the only tax shelter sold by J&G during 1998 was the Short Sale.  In looking at the commissions by month in the "Government" category, see Exh. A (DX 5835), one sees a dramatic up-tick in the commissions in the last quarter of the year – consistent with the testimony at trial that the tax shelter sales were heaviest during the last quarter as companies were able to forecast their tax burdens and execute the shelters before the end of the year.

19

With respect to the 1999 year in which Parse assisted in executing both Short Sale and Short Options ("SOS") tax shelters, we see a similar pattern. See Exh. B (DX 5836). It is clear from looking at the "Other" category over the course of 1999 that the SOS commissions are reported in that category. It is the only category with a significant jump in November and December, and the digital options trades do not match the description of any of the remaining categories. Attached as Exhibit E is a summary of "Other" and "Government" commissions for particular months. On that exhibit, we see that, for the last half of the year when the Government and "Other" categories are most active, Parse earned an extraordinary $798,339 in commissions in November and December alone. This jump occurred at the exact time that there was an incredible pressure to complete the SOS tax shelter transactions that year, as Sandra Burnside, Erwin Mayer, and Carrie Yackee testified. Moreover, in November and December 1999 there were no "Government" commissions, which is consistent with the testimony that J&G had switched from the Short Sale to the SOS tax shelter earlier in 1999, due to legislative changes. While it is possible that there were a handful of non-tax shelter-related "Government" and "Other" transactions, it is more than reasonable to conclude that those categories reflect almost exclusively tax shelter commissions in those months.

In 2000, we see the same pattern in the "Other" category — a very large jump in commissions at the end of the year. See Exh. C (DX 5837). This is not to say that the "Other" category in earlier months of 2000 does not contain tax shelter commissions; rather, it is to point out that the "Other" commissions in the fall of 2000 are highly likely to be due to the sale of the SOS and Swaps tax shelters. (Evidence at trial showed that the Swaps tax shelter was introduced shortly after the IRS issued Notice 2000-44, decrying the SOS tax shelter, in August 2000.)

In 2001, we again see a similar pattern in the "Other" category, no doubt due to the sale of

Swaps and HOMER tax shelters, both of which Parse materially assisted in implementing at Deutsche Bank. See Exh. D (DX 5838).

A confirming metric is to look at the dramatic change in Parse's broker ranking by gross from the beginning of the year to the end of the year, as reflected in Exhibits A through D, when the bulk of the tax shelter transactions were being implemented. See Parse Month-to-Date Rankings, attached as Exhibit F. Parse would vault towards the front of the pack in the last quarter of the year, even firm-wide. In 1999, Parse was the second ranked investment broker in all of Deutsche Bank Alex Brown, arguably due in large measure to the SOS tax shelter sales.

On Exhibit E, the total amount of commissions earned in the identified months is $2,995,750. Moreover, there are undoubtedly commissions earned in other months of the year from the tax shelter transactions. Therefore, the Government submits, a figure of approximately $3,000,000 from the tax shelter sales reflects a reasonable estimate of the commissions Parse earned from the tax shelter sales.

### E.   Restitution

The Government submits that the appropriate restitution figure in this case is $231,660,534. See Restitution Spreadsheet, attached as Exhibit G. The difference in the restitution amount of $190,355,836 sought in the Guerin sentencing and the $231,660,534 sought as to David Parse is due to the inclusion of one additional tax shelter, the tax returns for which were recently located, permitting the computation of precise actual losses figures. The additional shelter was that of Art Frigo, who executed a $47,490,958 Short Sale tax shelter through BDO. It is noteworthy that Frigo's fraudulent transaction was implemented with Parse's assistance (and which was the first J&G tax shelter implemented by BDO). See Art Frigo RAR, attached as Exhibit H. (There was also an

21

adjustment of the interest to bring it current to the date of sentencing.)[6]

## II.    SENTENCING GUIDELINES DISCUSSION

We are distinctly aware of the Court's intimate familiarity and facility with the Sentencing Guidelines and the law of sentencing, particularly in this post-Booker age.  We nonetheless think it helpful to review briefly the governing legal principles in this area.

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005); see United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").  The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005).  In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." Booker, id. at 260 (citations omitted); see also id. at 264

---

[6]  Parse has advised the undersigned that he does not dispute the overall restitution figure, but rather argues that the restitution amount should be calculated only on the backdated transactions, which is the amount that remains outstanding only on the Toporek transactions, as the other taxpayers with backdated transactions have already settled with the IRS. That amount is $244,376.73, with interest calculated to March 22, 2013.  See Exhibit I (Toporek Revenue Agent's Report).

("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is well aware, the other factors set forth in Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  See 18 U.S.C. § 3553(a).

In light of Booker, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.  See Crosby, 397 F.3d at 103.  First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112.  Second,

the Court must consider whether a departure from that Guidelines range is appropriate. <u>Id.</u> Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. <u>Id.</u> at 113. In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. <u>United States v. Jones</u>, 460 F.3d 191, 195 (2d Cir. 2006).

## III.   <u>3553(a) Analysis</u>

Although the Guidelines are, of course, no longer binding, the Guidelines sentence in this case reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to Parse's conduct. We respectfully submit that a significant term of incarceration is imperative in order to emphatically promote general deterrence.

### 1.   <u>The Nature and Circumstances of the Offenses</u>

The crimes Parse committed were literally off-the-charts in terms of the tax harm caused to the United States Treasury and in other regards as well. In particular, Parse's crimes several years and were unprecedented in the history of tax fraud prosecutions in the amount of fraudulent tax benefits created (over $7,000,000,000), amount of Guidelines tax loss caused (over $1,600,000,000), and amount of proceeds unlawfully obtained by the principal actors of which he was one ($146,000,000).

It goes without saying, of course, that tax offenses are serious, costly, and damaging to our nation's system of taxation. <u>See</u> <u>United States v. Ture</u>, 450 F.3d 352, 357 (8th Cir. 2006) ("[t]he criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system."). The Internal Revenue Code, § 6151(a) sets forth the general rule of our voluntary federal tax system: "Except as otherwise provided, when a return of tax is required under this title

24

or regulation, the person required to make such return, shall, without assessment or notice and demand from the Secretary, pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return."

The defendant is an investment adviser and CPA who should be held to the same, if not higher, degree of compliance with the law. Instead, in order to obtain the huge commissions that he collected, he was a knowing and willing participant in hundreds of fraudulent tax shelter transactions.[7] Parse also willingly and knowingly engaged in his own fraudulent shelter, and the shameless backdating of transactions, in order to assist the clients in achieving their desired tax losses.

The seriousness of the defendant's conduct, the amount of taxes he assisted clients in evading, and the substantial commissions he collected from Deutsche Bank in doing so, all support a significant prison sentence. The defendant acted without regard to his responsibilities as a citizen, financial adviser, and CPA to adhere to the tax laws of this country, and for that he must be held to account.

## 2.    History and Characteristics of the Defendant

While it is certainly appropriate for the Court to consider the defendant's good works, the Government respectfully submits that any credit given them must be balanced against the fact that his ability to perform many such good works resulted directly from the position he achieved and the

---

[7] It bears noting that Parse also assisted in implementing fraudulent "COBRA" tax shelters co-promoted by J&G and Ernst & Young accounting firm, and the post-Swaps, equally-fraudulent Market-Linked Deposit transaction, promoted by former BDO lawyer John Ivsan and others. The Government is not seeking to include those losses as relevant conduct, although they arguably are under U.S.S.G. § 1B1.3.

25

wealth that he accumulated as a result of the breathtaking fraud of which he was a significant and essential part.

Likewise, the Government submits that any testimonials to the defendant's character and honesty by his family and friends ought to be given little weight. See United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"). While there are certainly cases where it can be said that a defendant's offense conduct was in some way wildly aberrant or representative of so brief and isolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this demonstrably is not such a case. For years of his professional life, the defendant participated in what amounted to one of the most audacious tax frauds in history, resulting in a Guidelines losses of over $1.5 billion and approximately $3 million in income to him.

Even crediting any testimonials he submits at sentencing — and we do not in any way question the sincerity of those testimonials — the defendant, through his sustained criminal conduct while at Deutsche Bank Alex Brown, has shown that he is not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

In short, Parse's good works and devotion to friends and family are simply overwhelmed by the enormity of her criminal conduct.

### 3.    The Need To Afford Adequate Deterrence

One of the paramount factors the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C.

§ 3553(a)(2)(B). We respectfully submit that a substantial term of imprisonment is vitally necessary to achieve the goals of general deterrence, especially given nature and history of this type of case.

The convictions of Parse and his co-schemers occurred as the result of a prolonged investigation that literally took years and vast government resources to complete. Experience has shown that cases of this kind are very difficult to prosecute, for a host of reasons. First, because the transactions appear so complex on paper (usually by design, as in this case), it is often difficult to determine exactly what is going on, let alone to explain it to a jury.

A more fundamental problem in cases like this is that the documents themselves tell only part of the story. Those documents, by design, were intended to deceive — to give the appearance of legitimate, profit-motivated investment transactions that provided tax benefits. Moreover, the documents, particularly the tax opinions crafted, refined, reviewed, and sold by the J&G attorneys, recited factual representations ostensibly made by the J&G clients (including Parse!) and purporting to confirm those clients' core, investment motivations in pursuing the transactions. The reality of the fraud scheme lies in the utter falsity of those opinion-letter representations and the secret understandings and agreements among the participants that the transactions were being pursued solely for tax reasons; it is inherent that those falsities and secret understandings can be uncovered only through the testimony of witnesses. Witnesses, however, have not readily volunteered to cooperate and testify in cases of this kind, in part due to their own legal exposure.

Moreover, there was a remarkable abundance of arrogance in the legal, tax, and financial community that advanced the belief that the creation of an almost impenetrable wall of financial jargon, combined with the surface complexity of the transactions and purported ambiguity of the governing tax doctrines, would make a successful prosecution impossible or exceedingly

27

problematic. Other commentary advanced the belief that the conduct of the J&G and other tax shelter lawyers and purveyors amounted to nothing more than "aggressive" representation of the taxpayer clients. Parse's counsel have proffered essentially that "he was just the broker." The Government respectfully submits that an important — indeed, essential — function of the sentencing in this case is to send a very clear message that those beliefs are profoundly mistaken. Participating in a scheme to defraud the IRS through the implementation of concealed and misrepresented fraudulent tax transactions is — and has always been — a crime, and one deserving of significant punishment.

Stated differently, meaningful criminal sanctions are essential to stop frauds like those perpetrated by Parse and his cohorts, which amounted to nothing less than an assault upon the orderly fiscal operation of this country that depends on every taxpayer paying his or her appropriate share — no more, and no less. Civil proceedings, legislative efforts to rewrite the tax laws, and even previous criminal prosecutions have proven largely if not completely ineffective in deterring sophisticated, concerted tax shelter architects and implementers like Guerin and her co-conspirators.[8]

---

[8] There is an obvious reason why civil proceedings and changes in the tax laws have historically proven ineffective in stopping fraudulent tax shelters. A Tax Court decision or a change in the tax law will affect the behavior only of a person who is intent upon acting in conformity with the law. Participants in a fraudulent tax shelter scheme like Parse and the J&G attorneys, however, frequently treated the law as, at most, an annoyance — something that could simply be twisted or trifled with or even flat-out ignored. A stark example of this is in the treatment by the J&G lawyers of the law concerning Section 165(c)(2) of the Internal Revenue Code. That section disallows deductions from transactions like those involved in the J&G tax shelters unless the transactions were undertaken with the requisite profit motive. Courts have long construed section 165(c)(2) to require that the underlying transaction was undertaken "primarily for profit." Helvering v. National Grocery Co., 304 U.S. 282, 289 n.5 (1938) ("deductibility of losses under [predecessor to 165(c)(2)] may depend upon whether the taxpayer's motive in entering the transaction was primarily profit"); United States v. Generes, 405 U.S. 93, 105 (1972) (recognizing that profit motive test under 26 U.S.C. § 165(c)(2) requires establishing profit as "dominant" purpose); Austin v. Comm'r, 298 F.2d 583, 584

Indeed, attorneys in the Tax Division, our Office, and other parts of the country have pursued

criminal and civil proceedings challenging abusive shelters for years.   While those efforts may have

resulted in criminal convictions and, on the civil front, recouped tax revenues for the country, they

failed to stop those practices.[9]   Accordingly, substantial criminal sanctions are essential to

---

(2d Cir. 1962) ("This court has repeatedly held that, in determining the deductibility of a loss, the primary motive must be ascertained and given effect"); Arata v. Comm'r, 277 F.2d 576, 578-79 (2d Cir. 1960) (noting Helvering's requirement that profit be the "primary" motive; "since the profit motive was not the primary impetus to the [transaction], it was proper to disallow the deduction"); Dewees v. Comm'r, 870 F.2d 21, 33 (1st Cir. 1989) (Breyer, J.) (under § 165(c) taxpayer must show profit was primary motivation for claiming tax shelter losses); King v. United States, 545 F2d 700, 708 (10th Cir. 1976) ("in order to deduct a loss under §165(c)(2) the taxpayer must show that profit was the primary motivation"); Miller v. Comm'r, 836 F.2d 1274, 1276-77 (10th Cir. 1988) (the term "for profit" in § 165(c)(2) means "primarily for profit"); Yosha v. Comm'r, 861 F.2d 494, 499 (7th Cir.1988) (Posner, J.) (the term "for profit" contained in 165(c)(2) has been "interpreted to require that the 'nontax profit motive predominates'"; "primarily for profit" test not a matter of judicial gloss, but, rather, manifestation of purpose of 165(c)(2): "Forget the gloss: the effort here to turn paper losses into tax benefits was contrary to the original, unembellished purpose of section 165(c)(2)"); Resser v. Comm'r, T.C. Memo. 1991-423, 1991 WL 163536 (1991) ("This Court has consistently held that in order to deduct a loss under section 165(c)(2) the taxpayer must show that profit was the primary motivation. . . . This does not mean that losses influenced by tax planning are not deductible under section 165(c)(2).  Losses from a transaction entered into partly for tax-avoidance may still be allowable under section 165(c)(2), provided the required non-tax profit motive predominates.  In other words, the tax tail cannot wag the business judgment dog.") (emphasis added).  Yet most of these cases, and their significance with respect to Section 165(c)(2), were ignored in the opinion letters crafted by the J&G lawyers.  This was done, of course, because a fair reading and treatment of those cases in the J&G opinion letters would have sounded the death knell for the losses claimed from the J&G tax shelters.

[9]   The failure to deter the promotion and sale of fraudulent tax shelters may be attributable to the relatively light sentences imposed on certain shelter promoters in a previous generation of prosecutions, notwithstanding the gargantuan tax losses generated.  See United States v. Atkins, 869 F.2d 135 (2d Cir. 1989) (lead defendant sentenced by Judge Morris E. Lasker, pre-Guidelines, to two years' imprisonment after being found guilty at trial of generating over $1.3 billion in fraudulent losses; co-defendant sentenced to four months; second co-defendant sentenced to probation); Steve Coll, "Tax Shelter Founder Atkins Is Sentenced to Two Years," *Washington Post*, March 12, 1988 ("Though Atkins faced a maximum of about 85 years in prison, his two-year sentence fell within the range of punishments handed out recently in comparable cases"); see also United States v. Oshatz, 912 F.2d 534 (2d Cir,. 1990) (attorney/defendants sentenced pre-Guidelines to 40 and 28 months,

meaningfully attempt to put an end to these practices.  Put in the most stark but brutally realistic

terms, only the real fear of a substantial prison sentence will deter fraudulent shelter promoters,

salesmen, and facilitators like Parse from carrying on their activities and causing their harm.

Otherwise, such promoters will, like their clients, be inclined to roll the dice and bet that the

financial benefits of the tax shelters outweigh the likelihood and costs of getting caught.

Such an approach would be entirely consistent with the Guidelines, which specifically

recognize that general deterrence is a vitally important goal in sentencing for criminal tax offenses,

due to the relatively few criminal tax prosecutions that are brought.  As the Sentencing Commission

explained:

> The criminal tax laws are designed to protect the public interest in preserving the
> integrity of the nation's tax system.  Criminal tax prosecutions serve to punish the
> violator and promote respect for the tax laws.  Because of the limited number of
> criminal tax prosecutions relative to the estimated incidence of such violations,
> deterring others from violating the tax laws is a primary consideration underlying
> these guidelines.  Recognition that the sentence for a criminal tax case will be
> commensurate with the gravity of the offense should act as a deterrent to would-be
> violators.

U.S.S.G. ch 2, pt. T, introductory cmt.  See also United States v. Engle, 592 F.3d 495, 502 (4th Cir.

2010) ("Given the nature and number of tax evasion offenses as compared to the relatively infrequent

prosecution of those offenses, we believe that the Commission's focus on incarceration as a means

of third-party deterrence is wise.  The vast majority of such crimes go unpunished, if not undetected.

Without a real possibility of imprisonment, there would be little incentive for a wavering would-be

---

respectively); United States v. Manko, 979 F.2d 900 (2d Cir. 1992) (pre-Guidelines sentence of five
years in case involving over $500 million in false deductions); but see United States v. Senft, 84-
1254 (2d Cir. 1986) (Sentinel tax shelter promoter Michael Senft sentenced by Judge Owen to 15-
year pre-Guidelines term of prison, following trial and sentencing at which Senft continued to
maintain that shelters were lawful).

evader to choose the straight-and-narrow over the wayward path"); United States v. Burgos, 276 F.3d 1284, 1289 n.6 (11th Cir. 2001) (observing "[f]or a judge sentencing a defendant convicted of tax evasion, the chief concern may be general deterrence").

Moreover, in tax prosecutions there is good reason to impose Guidelines sentences as opposed to the more lenient probationary sentences sought by tax evaders. As the Guidelines commentary further explains:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced.

Guideline Commentary, Section 2T1.1.

Our Circuit has echoed the Commission's observations, noting that, "[o]nly a limited number of criminal tax prosecutions are brought relative to the number of alleged violations. *See* U.S. Sentencing Guidelines Manual ch. 2, pt. 2, introductory cmt." United States v. Trupin, 475 F.3d 71, 76 n.6 (2d Cir. 2007) (seven- month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million fails to reflect seriousness of offense). As the Trupin court aptly observed, a tax evader, is "in effect [stealing] from his fellow taxpayers through his deceptions." Id. at 76; see also United States v. Taylor, 499 F.3d 94, 102 (1st Cir. 2007) (vacating sentencing of probation with one year in a halfway house for tax fraud offense where tax loss was $129,879 finding that "[w]hile tax fraud is not violent in nature, at its heart, it is theft, specifically theft of money to which the public is entitled").

Judge Weinfeld aptly articulated, in a pre-Guidelines setting, the need for incarceration as

31

a result of the tax evader's violation of the basic compact under which all American income-earners live:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment.  The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns.  I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

United States v. Tana, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13) (relevant pages attached as Exhibit B to Govt's Sentencing Memorandum as to D. Guerin).  In a recent case involving a defendant who utilized an undeclared Swiss bank containing millions of dollars and that resulted in hundreds of thousands of dollars of tax loss and a Sentencing Guidelines range of 24 to 30 months (facts that are different from those present here), Judge Gardephe echoed Judge Weinfeld's sentiments in a manner applicable to this case:

> Our tax system is, at bottom, a voluntary one.  Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct.  I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment.  There's nothing about the facts here that suggest to me that a different outcome is appropriate.

United States v. Werdiger, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50) (relevant pages attached as Exhibit C to Govt's Sentencing Memorandum as to D. Guerin).  And this Court, too, has specifically recognized the important role of general deterrence given the relative scarcity of criminal tax prosecutions.  See United States v. Mullahy, 10 Cr. 554 (WHP) (November 23, 2010; Tr. 10) (relevant pages attached as Exhibit D to Govt's Sentencing Memorandum as to D. Guerin)

32

("Looking at the 3553(a) factors in this case, the Court agrees with the Government that tax crimes are not prosecuted frequently and, therefore, there is a need for deterrence.").

In sum, general deterrence in cases like this can be accomplished *only* through a meaningful term of incarceration.

### 4.      The Need To Avoid Unwarranted Sentence Disparities

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal sentences.  Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor which the Court must separately consider pursuant to 18 U.S.C. § 3553(a)(7).  We attach for the Court's consideration a chart of sentences in other tax cases, including ones with comparable loss amounts.  See Exhibit J (the "Sentencing Chart").  The Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety or criminal tax contexts, including, most pertinently, tax shelter prosecutions.

Although we believe that there is significant utility in the Court considering what has happened in other cases, we hasten to note our acute awareness that, at best, such guidance can get the Court only so far.  Every case is unique; every individual defendant is unique.  We do not mean to suggest otherwise.  The reasons for referencing the other sentences are straightforward:  first, while we fully recognize that what we believe to be an appropriate application of the Sentencing Guidelines leads to an advisory Guidelines range calling for a very substantial sentence, similar sentences have been meted out in cases involving comparable overall conduct and tax losses; and second, it is not uncommon for defendants who are less criminally culpable than Guerin to receive and serve lengthy sentences of incarceration.

To the extent that Parse's attorneys may suggest otherwise at sentencing,  the universe of tax

shelter sentences that the Court should consider when fashioning Parse's sentence should not be limited to those stemming from the KPMG (United States v. Stein, 05 Cr. 888 (LAK)), Ernst & Young (United States v. Coplan, 09 Cr. 555 (SS), and Bank One (United States v. Ohle, 08 Cr. 1109 (JSR)) tax shelter cases. There is no persuasive argument why the tax shelter sentences imposed in the Stein, Coplan, and Ohle cases are the only ones the Court should consider when weighing the appropriate sentence in a case involving, among other things, conduct designed to encourage hundreds of others to violate the tax laws. In fact, no persuasive argument exists, as the proper prism through which the Court should view its statutory mandate to avoid unwarranted sentencing disparities is one that considers tax shelter fraud sentences on a nationwide basis, not simply within a single district. See United States v. Snyder, 136 F.3d 65, 68-70 (1st Cir.1998) (explaining that the phrase regarding the need to avoid "unwarranted sentencing disparities" in the Sentencing Guidelines reflects a "concern with variations among federal courts across the nation, without reference to their state counterparts," and that the "[G]uidelines seek to perform uniform sentencing among federal courts in respect to federal crimes").

That is not to say, of course, that the Stein, Coplan, and Ohle cases do not provide some indications of what certain Southern District Judges determined to be the appropriate sentences, based on the unique facts of those cases. In that regard, it is important to note certain critical distinctions between the facts of this case and those involved in Stein, Coplan, and Ohle. First, Stein involved $111 million in Guidelines tax losses, while this case involves almost fifteen times that amount — over $1.5 billion. Second, the defendants in Stein were convicted of participating in one

34

fraudulent tax shelter — BLIPS[10] — while Guerin's conviction here is predicated principally on a conspiracy charging four separate tax shelters sold for almost six years by Guerin and others.  It is also useful to note that, despite those distinctions, the critical actors in the Stein case — Larson, Pfaff, and Ruble — received sentences of 120, 97, and 78 months, respectively.

With respect to the Coplan case, there are certain similarities in the underlying conduct: four tax shelters were involved in each case, and the conduct occurred roughly at the same time Parse and his co-schemers were engaged in the Short Options Strategy and HOMER.   In fact, there was an overlap with Coplan with respect to the COBRA tax shelter, whose options Parse helped to implement at the same time he was involved in the charged scheme to defraud.  There were also critical distinctions, however, including the fact that the Copaln indictment charged tax evasion offenses only with respect to one of the tax shelters involved (CDS Add-On).  Thus, the case was tried not principally on a lack-of-economic-substance theory but on the theory that the defendants engaged in a conspiracy to lie to the IRS and others about the operation of the Ernst & Young tax shelter transactions and the reasons why the clients entered into them.  Finally, the Ernst & Young partners who were convicted in the case did not engage in the back-dating of tax shelter transactions and did not receive anywhere near the gargantuan fees collected by Daugerdas, Guerin, Mayer, and Parse.  Indeed, the Ernst & Young defendants basically collected their partnership compensation, which did not include a percentage of the fees charged to the clients.

Finally, the Ohle case involved approximately $110 million in Guidelines tax loss (a fraction

---

[10]  BLIPS was an acronym for the Bond Linked Issue Premium Structure, a Son-of-Boss tax shelter that was predicated on the same "contingent liability" tax play as the short sale, short option, and SWAPS tax shelters.

of that involved here) stemming almost exclusively from the HOMER tax shelter, although Ohle used a different fraudulent transaction for his own tax evasion. Moreover, the criminal conduct in Ohle involved a much narrower time frame — approximately 2.5 years. For that more circumscribed conduct, Ohle received a sentence of 60 months.

In addition to the Stein, Coplan, and Ohle sentences, we respectfully suggest that the sentences imposed in the Bank One, Aegis, Security Trust, American Rights Litigators, and Anderson Ark tax shelter cases are worthy of consideration, since those cases, like this one, involved the sale of tax shelters or tax evasion packages to numerous taxpayers. As the Sentencing Chart makes clear, those cases involved sentences of between 96-240 months for many of the defendants, based on Guidelines tax losses that ranged from $7.5 million to $120 million — fractions of the tax loss here.

### 5.   The Appropriate Sentence

The Government submits that a sentence at or around that imposed on defendant Donna Guerin, which is approximately one-third of the governing Guidelines range. Such a sentence will best serve the ends of justice pursuant to 18 U.S.C. § 3553(a). Such a sentence is also commensurate with others charged with the most serious and sustained tax and financial institution crimes. Finally, such a sentence is imperative for the financial institution participants in, and enablers of, the audacious tax fraud schemes like that involved in this case.

Any argument or suggestion that the defendant has been punished enough by the loss of his business should be rejected. According to this logic, one who is a successful, well-educated business man should not be sent to jail for committing the same crime that would justify a sentence of imprisonment for a less well-heeled and well-educated defendant. We respectfully suggest that the

36

Court should reject the notion that the professionally educated should be sentenced more lightly than the poor or powerless or less-effectively-represented because, for the former, the humiliation and shame of conviction alone is more devastating than it would be for those who have enjoyed fewer advantages in life.

We respectfully submit that a substantial term of imprisonment is warranted for both general and specific deterrence reasons, would reflect the seriousness of Parse's fraudulent conduct, and would promote respect for the law. A financial professional contemplating the potential fruits of massive fraudulent conduct should see and know that a significant jail term is its likely consequence. A term of probation for Parse's crimes, or even one that includes a home confinement component, on the other hand, would rightly be perceived as a slap on the wrist and would serve to deter no one.

## CONCLUSION

The tax fraud scheme of which Parse was convicted could not have been carried out without the willing participation of financial institution players like Parse. Schemes like that, however, threaten the orderly financial functioning of this country that depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status or who their broker or other professional advisers might be. That system of voluntary compliance would crumble if financial professionals who engage in massive tax fraud schemes believed they could cheat with impunity or that the most severe sanctions that they would face when caught were merely the payment of financial penalties and the loss of a license, together with a de minimis sentence of confinement — the relative equivalent of a slap on the wrist.

Substantial imprisonment is essential in a case like this, lest the fraud perpetrated by the defendant breed skepticism and bitterness among hard-working American taxpayers who fulfill their tax obligations by paying their taxes honestly and who do not have the financial wherewithal or sophistication to utilize tax shelters and their corrupt purveyors to evade their tax obligations. On the unique facts of this case, a substantial sentence is entirely appropriate.

Dated:   New York, New York
         March 15, 2013

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York


By:   ___s/Stanley J. Okula, Jr._____
      STANLEY J. OKULA, JR.
      Assistant United States Attorney
      (212) 637-1585
      stan.okula@usdoj.gov
      NANETTE L. DAVIS
      Special Assistant United States Attorney
      (212) 637-1117
      nanette.l.davis@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non registered participants on the above date.

By:     s/Stanley J. Okula, Jr.
STANLEY J. OKULA, JR.
Assistant United States Attorney
(212) 637-1585
stan.okula@usdoj.gov

39