**ZUCKERMAN SPAEDER** LLP

1185 AVENUE OF THE AMERICAS   31ST FLOOR
NEW YORK, NY 10036-2603
212.704.9600   212.704.4256 fax   www.zuckerman.com

PAUL SHECHTMAN
Partner
212-704-9600
Pshechtman@zuckerman.com

BY HAND

March 7, 2013

The Honorable William H. Pauley, III
United States District Judge
Southern District of New York
500 Pearl Street, Room 2210
New York, NY 10007

    Re:    United States v. David Parse, et al., 09 Cr. 581 (WHP)

Dear Judge Pauley:

    This letter is respectfully submitted on behalf of David Parse, who is scheduled to be sentenced for tax-related crimes on March 22, 2013. For the reasons discussed below, we believe that a non-incarcerative sentence would be a fair and parsimonious one. See United States v. Dorvee, 616 F.3d 174, 182 (2d Cir. 2010)("it is the sentencing court's duty to impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)").

A.    Background

    David Parse was born in Detroit, Michigan, on December 7, 1961. He was the youngest of five children of Sylvia and Henry Parse. A World War II veteran, David's father worked two jobs for most of his life. He was a mailman by day, and a factory worker at night. David's mother worked part-time as a laundress in a local restaurant. The two parents instilled

**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 2

in their children the importance of work, education, family and respect for others.  See letter of Bridget Rodgers ("Dave comes from a blue-collar background; his dad was a mailman and his mom was a saint").[1]

David attended local Catholic schools, where he excelled in academics and sports. See letter of Scott Mordell ("David was an academic, sports and social leader among our [high school] class").  He started on the varsity basketball team as a freshman and was among the top players in the state his senior year.  Although recruited by several colleges, he chose to attend the University of Michigan, a state school, and gave up playing organized sports.

What he did not give up was his work ethic.  David got his first job at age 11, delivering the Detroit News to his neighbors.  Every day after school and on weekends, he rode his bicycle on his route.  In eighth grade, he began working part-time in a local restaurant as a busboy (the same restaurant where his mother cleaned linens).  He worked there on weekends during the school year and 30 to 40 hours a week in the summer.  The job enabled him to purchase a used car for $600.  With a car, he could drive across town to work at a famous seafood restaurant; beginning his senior year in high school, it became his regular employer.

David graduated from Michigan in 1984 with a bachelor's degree in Business Administration.  He put himself through college, commuting from Ann Arbor to Detroit to work as a waiter in the seafood restaurant.  Although most of his time went to studies and work, David

---

[1] Letters from David's family and supporters are attached as an appendix to this submission.



**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 3

enjoyed his college years immensely, and many of his closest friends are Michigan classmates. To this day, he "tailgates" with friends before Michigan football games and donates generously to the school. See letter of Kenneth Norwick (our "tailgate [group] . . . has become like an extended family . . . focused on the children"); letter of Bridget Rodgers ("[e]ven though he has never mentioned it, I know [David] has been a generous donor to the University").

B.   Business Degree and Brokerage Industry Employment

After graduating from Michigan, David worked two years at Touche Ross as an accountant, doing audits for local businesses and not-for-profit institutions. In August 1986, he left the firm and reenrolled in Michigan to get an MBA degree. Again, he paid his own way. He lived at home, commuted to school, and went back to waiting tables. He graduated in 1988 with a major in Finance and Economics and obtained employment at Goldman Sachs in Detroit as a broker.

From 1988 to his indictment in 2009, David enjoyed considerable success as an investment consultant for institutions and high net worth individuals. When Goldman left Detroit, David moved to Kidder Peabody in Troy, Michigan, and then to Credit Suisse First Boston in Chicago. In 1995, he was recruited to join Alex Brown & Sons, which was subsequently acquired by Bankers Trust and then Deutsche Bank. The name on the front door changed, but David's responsibilities did not.


**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 4

      As a broker, David had 30 to 40 long-term customers, and his goal was to assist them to invest their money wisely. A former business associate writes this about him:

> [A]t the Chicago offices of Credit Suisse First Boston . . . I interacted with David on a constant basis during our tenure at the firm. I literally could overhear his phone calls with clients . . . . In all of [our] interactions I found David to be diligent, intelligent, and most of all honest. David always put his client's interests first, and prided himself on his ability to protect [their] assets. He took very seriously his fiduciary duty, and our entire group relied upon him as a sounding board when evaluating the appropriateness of investment vehicles. As an example of how much I trust David in business, years ago I asked him to consult on the endowment fund for an inner city high school that I oversee . . . . [As] you can imagine . . . I would only ask David to participate if I was completely convinced of his character.

Letter of Phil Allen.

      Others who have worked with David sound the same theme. <u>See</u> letter of Jeffrey DeYoung (he would "always put clients first and do the right thing; when the market was starting to unravel . . . Dave was the first to pull his clients out in spite of his loss of revenue"); letter of Susan Manske ("[i]n my opinion, Dave has always been a straight shooter, a conservative investor protecting his clients from downside risk, [and] a staunch supporter of ethical behavior"); letter of John and Kathryne McGuire ("David chose the securities business so that he could help his clients protect their assets; he truly understood his fiduciary obligations and [put] his client's interest first"). In all his years as a broker, David received <u>no</u> complaints from his customers for his investment advice.[2]

---

[2]    David has been sued by several taxpayers whose tax shelters were disallowed.


**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 5

In 1998, David was introduced to Paul Daugerdas; his relationship with Daugerdas and the Jenkens & Gilchrist firm is discussed in Part D below.

C.   Family, Community and Friends

David met Theresa Austerberry in 1987, when they were at business school together, and they have been married for 20 years. They have supported each other's careers -- when Theresa found a better position at McKinsey's Chicago office, David left Kidder Peabody to move with her -- and have devoted themselves to family and community. They have three boys -- ages 17, 15, and 12 -- whom they have raised conscientiously. The letter of David's brother-in-law, James Yetter, describes it best:

> [David's] three sons (my nephews) are wonderful young men with exceptional character traits that I know are a direct result of Dave's strong parenting .... [H]e treats them with a very good combination of love, caring and high expectations. They all have chores to do and household responsibilities. They are expected to have jobs in the summer. They have a healthy regard and respect for others. Study time is sacred. Responsibilities are not to be taken lightly. It's not "enforced," it's an expectation.

Letter of James W. Yetter.

Other letters confirm Mr. Yetter's observations. See letter of Andrew Miller ("[h]is emphasis and influence on his children have also resulted in good, respectful, well-rounded and academic kids"); letter of Phil Allen (David "teaches by example, and extolls the values of hard work and mutual respect; everyone pitches in, whether it is preparing a family


**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 6

meal or helping a younger sibling . . . do [his] homework"); letter of Thomas E. Carnaghi (David "is truly a model father [who] sets the bar high for his boys").[3]

For the past 15 years, David has devoted much of his free time to coaching youth sports teams in his community. In his letter to the Court, Phil Allen describes the depth of David's commitment:

> In our town's Little League Baseball organization, David has held every volunteer position from an assistant coach to a team manager. I have seen him do everything from raking baseball fields . . . to throwing batting practice . . . . During basketball season, David has also been the coach or assistant coach for numerous grammar school teams. If there is one example of the depth of David's commitment to coaching, it is the basketball training sessions he designed and managed for students outside of the organized teams he coached. On his own initiative, David arranged for a gym to be available during the week for all children, even those who didn't make a team . . . . There are not many of us . . . who would find the time to make such an impact on the lives of the children in their community.

Letter of Phil Allen; see also letter of John and Kathryne Maguire ("[c]oaching children is often a difficult and thankless job in a small community; David has been a leader in Hinsdale in volunteering his time and knowledge to help our community").

---

[3] As the Presentence Report notes, Theresa has had serious health problems since 2008. In February 2008, Theresa began experiencing severe dizziness, and the episodes often lasted hours and sometimes days. Neck pain, heart palpitations and stomach pain followed. See letter of Theresa Parse. A battery of tests has proven negative, and medication and a change of diet have given her some relief. But health issues, which may be stress-related, continue to plague her.


ZUCKERMAN SPAEDER LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 7

As the letters reflect, coaching for David is about more than teaching a 12-year-old to turn a double play. "He wants the kids to develop their athletic . . . skills and [for them] to be as successful . . . as possible, but he clearly believes that there are things more important than winning games." Letter of Charles Austerberry; see also letter of Theresa Parse ("Dave understands how sports can teach children valuable life lessons"). David relates to each child individually and gives each a chance to play. When a boy with severe disabilities was on the basketball team, David "made sure every other boy . . . went out of [his] way to . . . help him make a basket before the end of the season." Id. As one observer notes, David's "measured, personal approach contrasts markedly with the loud cacophony typically employed by [those] . . . who attempt to coach [children's] sports teams." Letter of Charles Austerberry.[4]

What may best reflect David's character is his commitment to his friends. In their letters to the Court, many of them recount stories of David's support in their times of need. See e.g., letter of Bridget Rodgers (when I was pregnant and "told I had an infection that would cause

---

[4] One parent whose child is a gifted athlete writes this about David:

> The thing that has endeared me most to Dave is the way he coaches the boys in basketball. Over the years, he has coached . . . my son ▮ . . . [Dave] is always calm, guiding, teaching and encouraging the boys in a way that is so helpful. Dave has gone out of his way to tell my wife Kimberly and me how special ▮ is as an athlete and he encourages us to continue his development. The vast majority of coaches in our community are screamers and not teachers and are singularly focused on their [own] kids. Dave is different. I sincerely appreciate the many hours Dave has spent with my son.

Letter of Venanzio Arquilla.


**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 8

horrific birth defects, Dave cried openly with us" and discussed the "moral, ethical and emotional dilemmas this raised"); letter of James Yetter ("[w]hen our friend's daughter was on her death bed, Dave . . . flew in from Chicago . . . to provide support"); letter of Andrew Miller ("when my son was diagnosed and hospitalized with a mental illness . . . , David was there to . . . counsel and encourage me"); letter of Thomas Carnaghi (when "my then 12 year old daughter had a brain aneurysm burst . . . [David] drove in from Chicago to spend time with me and my family; he spoke with me every day during the three plus weeks of this ordeal"). As one friend puts it, "Dave is a giver, not a taker; if you need some help, he is the friend you can call." Letter of Kenneth Norwick.

Notably, David's good deeds have involved his time and effort and not his money. Nor has he sought recognition for what he has done. Just the opposite is true: he has been reluctant to ask others to write on his behalf because asking for something in return has never been his way. See United States v. Cooper, 394 F.3d 172, 177 (3d Cir. 2005)(noting that defendant's actions were not "detached acts of charity . . . [but were] in a very real way, hands-on personal sacrifices, which have had a . . . positive impact on the lives of others").

D.  The Instant Offense

As noted above, David met Paul Daugerdas in 1998, but the relationship between Deutsche Bank and Daugerdas began earlier. In the early 1990's, Jason Shih was one of a group of brokers in Alex Brown's San Francisco office, who began executing bond shorts for Daugerdas' clients. When Shih was transferred to Chicago to supervise the office, he continued

 **ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 9

the relationship. Shih introduced David and his partner Rod McKay to Daugerdas, and they began doing business.

As the Court knows, Deutsche Bank's participation in the tax shelters was approved at the bank's highest levels.[5] That fact, coupled with the prominence of the Jenkins firm and the knowledge that other law and accounting firms were marketing similar products, gave David comfort that the tax shelters were lawful. Like many others, he believed that Daugerdas and his partners had found a "loophole" that could be exploited until it was closed. From 1998 to 2001, tax shelter trades became a part of David's business.

As we see it, the jury accepted the proposition that David was not a culpable participant in the overall Jenkins tax shelter scheme. His acquittal on the tax conspiracy count and the substantive tax evasion counts (and the complete acquittal of his co-defendant Craig Brubaker) confirm the point. The jury, it seems, concluded that David did not know that a lack of economic substance made the Jenkins shelters illegal. If that is correct, then David's convictions for mail fraud and tax obstruction reflect his involvement in the three "backdating" transactions. In each instance, trades effected in one year (e.g., 2002) were used to generate tax

---

[5] See, e.g., Tr. 2965 (discussing letter from Irwin Mayer to Bob Price, Alex Brown's general counsel); Tr. 5678-79 (confirming that approvals from legal, credit, tax and compliance had been obtained for the Homer transaction).



**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 10

losses in the prior year (e.g., 2001). The prosecution focused on those transactions in its summations, as did the jury in its deliberations.[6]

E.   Guidelines Calculation

In its preliminary Report, the Probation Office calculates an offense level of 40 and a Guidelines range of 292 to 365 months. It assumes a tax loss amount of $1.5 billion and adds "points" for sophisticated means (§ 2T1.1(b)(2)) and special skill (§ 3B1.3). We have written to Probation and asked it to reconsider that calculation. Under the Court's rules, its final Report is due after ours, and so we summarize here our argument that the Guidelines range should be far lower than where Probation has preliminarily put it.

---

[6]   Juror No. 1's letter to AUSA Okula goes far to show that David's conviction was only for the "backdating" transactions:

> [W]e did have qualms with Mr. David Parse. <u>I solely held out for two days on the conspiracy charge for him</u> -- I wanted to convict 100%, (not only on that charge) -- but on Tuesday, May 24, 2011, we had asked for the Judge's clarification of "willfully" and "knowingly", I believe, and I had to throw in the towel. I did fight the good fight, however, and I felt that Mr. Parse played his integral part and was a key element in the elaborate scheme/scam. <u>The backdating was enough for the other charges.</u>

Letter of Catherine Conrad 5/25/11 (emphasis added).



**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 11

    Our lower Guidelines calculation begins from the premise that Mr. Parse was convicted only of the three "backdating" transactions. If that is so, then the proper loss calculation is this:

|          |            |
|----------|-----------:|
| Coleman  | $2,738,630 |
| Blair    | $ 470,035  |
| Aronoff  | $ 536,770  |
| Toporek  | $ 62,553   |
| TOTAL    | $3,807,988 |

These numbers are based on the additional assessments calculated by the IRS, which are in evidence.

    Moreover, if the Guidelines calculation is based only upon the three "backdating" transactions, then the enhancement for "sophisticated means" should not apply. While it is true that the tax shelters created fraudulent tax losses through a series of complex transactions, the "backdating" involved only correcting certain trades -- e.g., canceling a transaction in stock and effecting one in foreign currency. The new transactions were shown in Deutsche Bank's books in the month in which they occurred. No records were altered. Thus, this is not an instance of "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." See Commentary § 2T1.1 Application Note 4.

    Likewise, an enhancement for "special skills" under § 3B1.3 is unwarranted. The Report states that Mr. Parse "used his special skills as a former stock broker and CPA to materially facilitate his design and implementation of the highly-complex financial products that were involved in different tax shelters." ¶ 64. Mr. Parse, however, had no role in designing the


**ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 12

tax shelters and did not function as a CPA. He gave no investment advice, and the trades were executed by his assistant. In short, his role as a broker in the three "backdating" transactions is too thin a reed to support this enhancement.

If all of this is correct, then Mr. Parse should be at offense level 24, with a Guidelines range of 51 to 63 months. Of course, we believe that even that calculation produces a range that is still far too harsh. See, e.g., Smirlock v. United States, 2005 U.S. Dist. Lexis 7321 at *6 (noting that "the amount of loss that actually winds up resulting from a person's conduct . . . can be arbitrary" and may not reflect culpability); Bowman, The Failure of the Federal Sentencing Guidelines: A Structural Analysis, 105 Colum L. Rev. 1315, 1328 (2005)("[a]t or near the root of virtually every serious criticism of the guidelines is the concern that they are too harsh").

F.  Conclusion

In her sentencing submission, Donna Guerin catalogued the sentences that have been imposed on those who designed and marketed illegal tax shelters. See Guerin's Am. Sentencing Mem. 13-16, ECF No. 592. They have varied greatly in length. What makes this case different is that David Parse did not design or market tax shelters; he was a broker executing trades. Indeed, to our knowledge, of all of the brokers who performed that function for Jenkins and other law firms, he and Craig Brubaker were the only two people who were prosecuted, and he is the only one who stands convicted.

# ZUCKERMAN SPAEDER LLP

The Honorable William H. Pauley, III
March 7, 2013
Page 13

   As noted above, we believe that the jury convicted David for his involvement in three backdating transactions from which he barely profited. He has already suffered greatly for that conduct. Since 2004, when the criminal investigation commenced, this matter has hung over him. His once-thriving brokerage business has collapsed. His wife's health has suffered. See supra n.3. His children have felt the sting of comments from others who have learned of David's conviction. And the stigma of the conviction haunts David, especially because it is antithetical to the values with which he was raised. See letter of Theresa Parse ("our lives [have] essentially [been] placed on hold, as we try to raise our three sons in a safe and secure environment").

   More than 15 years ago, the United States Supreme Court reminded that the "uniform and constant . . . tradition for the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996). In this submission, we have tried to show that David Parse is a fundamentally decent man. He believes in family, hard work, helping others, and being actively involved in community. The conduct for which he was convicted, we believe, was at the periphery of the Jenkins scheme. On this record, we respectfully submit that a non-incarcerative sentence would be just. It would not diminish respect for the law. See United States v. Adelson, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006)("if ever a man is to receive credit for the good he

 **ZUCKERMAN SPAEDER LLP**

The Honorable William H. Pauley, III
March 7, 2013
Page 14

has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing").[7]

                Respectfully submitted,

                Paul Shechtman

PS/wr

cc: AUSA Stanley J. Okula, Jr.
    AUSA Nanette Davis

---

[7]     In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court emphasized that a non-incarcerative sentence does not mean "letting an offender off easily." The Court wrote:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

<u>Id.</u> at 59.