UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

UNITED STATES OF AMERICA,                                   :

                                                            :   S6 09 CR 581 (WHP)

              - v. -

                                                            :

PAUL M. DAUGERDAS,                                          :

                           Defendant.                       :

-------------------------------------------------------------------X

ELEANOR DAUGERDAS,                                         :
PMD INVESTMENTS LLC, and
WBLG WALWORTH LLC,                                         :

                           Petitioners.
-------------------------------------------------------------------X

**MEMORANDUM OF LAW OF PETITIONERS ELEANOR DAUGERDAS
PMD INVESTMENTS LLC AND WBLG WALWORTH LLC IN SUPPORT
OF THEIR MOTION FOR SANCTIONS**

James R. DeVita
LAW OFFICES OF JAMES R. DeVITA, PLLC
81 Main St., Suite 504
White Plains, New York 10601

Of Counsel:
Ronald E. DePetris
P.O. Box 6034
Southampton, New York 11969
(631) 283-8652

*Attorney for Petitioners Eleanor Daugerdas, PMD
Investments LLC and WBLG Walworth LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.     The Duty to Preserve Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          1.    Notice and Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          2.    Culpable State Of Mind. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          3.    Relevance and Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     B.     The Appropriate Sanctions for the Goverment's Violation
           of the July 2018 Order and the Duty to Preserve Evidence. . . . . . . . . . . . . . . . . . 19

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>

*Bagley v. Yale University, 318 F.R.D. 234 (D. Conn. Dec. 22, 2016)* .................................... 6

*Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) .......................................... 3

*Funk v. Belneftekhim, 2020 U.S. Dist. Lexis 8890 (E.D.N.Y. Jan. 17, 2020)* ...................... 4, 6, 9

*In re Pfizer Inc. Sec. Litig.,* 288 F.R.D. 297, 313 (S.D.N.Y. 2013) ............................................18

*In re Various Grand Jury Subpoenas*, 235 F.Supp. 3d 472 (S.D.N.Y. 2017) ........................... 8

*Luellen v. Hodge*, No. 11 Civ. 6144 (MWP), 2014 U.S. Dist. Lexis 42527, 2014 WL 1315317
(W.D.N.Y. Mar. 28, 2014) ............................................................................................... 3

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99
 (2d Cir. 2002) ................................................................................... 9, 9 n. 3, 19, 21, 24

*Ronnie Van Zant, Inc. v. Pyle, 270 F.Supp.3d 656 (S.D.N.Y. 2017), rev'd on other grounds, 906
F.3d 253 (2d Cir. 2018)* ............................................................................................... 3

*United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998)* .......................................................17

*United States v. Banco Cafetera Panama, 797 F.2d 1154 (2d Cir. 1986)* ............................... 5

*United States v. Daugerdas, 837 F.3d 212 (2d Cir. 2016)* ..........................................................10

*United States v.  Nejad*, 487 F. Supp. 3d 206, 2020 U.S. Dist. Lexis 169686*, 2020 WL 5549931
(S.D.N.Y. Sept. 16, 2020) ............................................................................................... 17

*United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006) ................................................. 14

*United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) ................................................. 8

*United States v. Stein*, 495 F. Supp. 2d 390 (S.D.N.Y. 2007), *aff'd*, *United States v. Stein*,
541 F.3d 130 (2d Cir. 2008).) ........................................................................................15

*United States v. Rothstein, Rosenfelt, Adler, P.A., 717 F.3d 1205
(11th Cir. 2013)* ...................................................................................................... 5

ii

**Page**

*United States v. Walsh, 712 F.3d 119(2d Cir. 2013)* ........................................................5

*United States v. Watts*, 786 F.3d 152 (2d Cir. 2015) ................................................... 22, 23

*United States v. Zangrillo*, 2020 U.S. Dist. Lexis 36364, at *7-8, 20-21, 25-28 (D.Mass. March 3, 2020) .......................................................................................................... 7, n.2

*West v. Goodyear Tire & Rubber Company*, 167 F.3d 776, 779-780 (2d Cir.  1999) ............... 24

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) .................................. 3

## RULES AND STATUTES

Federal Rules of Civil Procedure, Rule 37 (b)(2)(A) .......................................................1

Federal Rules of Civil Procedure, Rule 37 (b)(2)(C) .......................................................1

Federal Rules of Criminal Procedure, Rule 32.2(b)(4) ....................................................22

21 U.S.C. § 853(k) ...........................................................................................................25

21 U.S.C. § 853(n)(6) ........................................................................................................5

This memorandum of law is submitted in support of petitioners' motion for sanctions pursuant to Rule 37(b)(2)(A) and (C), Federal Rules of Civil Procedure, for the government's violation of the Court's July 26, 2018 (Docket No. 935) Order directing the government to search for and produce bank records for petitioners' use in preparing the amended petition in this ancillary forfeiture proceeding, and pursuant to the inherent power of the Court, for the government's violation of its duty to preserve as evidence the unredacted bank records at issue.

PRELIMINARY STATEMENT

The Jenkins & Gilchrist ("J&G") bank records that are the subject of this motion are critical to resolution of the disputed issue in this proceeding, which is whether tainted tax shelter legal fees received by the law firm J&G from the criminal defendant Paul Daugerdas' tax shelter clients were commingled with legal fees generated from numerous other clients of the law firm before the payments to Paul Daugerdas that are the basis for the government's forfeiture claim. Having taken the position in the underlying criminal case (both in the district court and on appeal to the Second Circuit) that there was no commingling of funds, it seems inconceivable that the government had not issued a subpoena and obtained those key bank records (the J&G Illinois and J&G Texas bank accounts) before making these representations: records which would once and for all resolve this disputed contention. Yet, after the district court issued an order in this ancillary proceeding directing the government to search for and produce the J&G bank records for petitioners' use in preparing the amended petition called for by the Second Circuit's decision reversing this Court's dismissal of the original petition, the government failed to comply with that order in a timely fashion – i.e., prior to the filing of the amended petition. The government did not even proffer an explanation as to what happened to the J&G bank records that it obviously had during the underlying criminal case.  The government chose instead to force the

1

petitioners to file the amended petition relying on "information and belief."  Then, ironically, the government filed a motion to dismiss the amended petition on the ground of insufficiency of the commingling allegations.  *See* Declaration of James R. DeVita (Doc. No. 990, filed on May 1, 2019, in opposition to motion to dismiss amended petition) ("DeVita Dec. I"), a copy of which is attached as Exhibit A to the Declaration of James R. DeVita, dated April 29, 2021 submitted in support of this motion ("DeVita Dec. III").

After the government's motion to dismiss was denied and discovery commenced, the government belatedly produced to petitioners' counsel *redacted* copies of J&G Illinois and J&G Texas bank records that had been produced by J&G's counsel (the law firm Davis Polk & Wardwell ("DPW")) to the government in April 2007 pursuant to grand jury subpoenas.  Even those redacted bank records make a compelling showing that the government's longstanding assertions in the underlying criminal case and this ancillary proceeding (that the tax shelter fees were not commingled with other fees received by the law firm) were significantly inaccurate: numerous payments involving a significant amount of money were made to Paul Daugerdas from J&G bank accounts *other than* the J&G Illinois account, which accounts clearly contained commingled funds.  Moreover, the government has still failed to produce unredacted copies of key J&G bank records.  It advises us that it received only selected and redacted copies of the statements from J&G and its counsel.  However, the government has failed to explain why the redacted copies of bank records in its possession at the time of the Court's July 2018 order were not produced for use in preparing the amended petition as required by that order.  It has also failed to explain why it did not demand production of unredacted copies of key bank records from J&G and its counsel during the underlying investigation and criminal case, or direct J&G and its counsel to preserve complete, unredacted copies of the statements for later use or

comparison if that became necessary.  The government concedes that it did not direct J&G's

counsel DPW to preserve copies of the unredacted bank records.  Petitioners did serve a

subpoena on Bank of America for production of the J&G bank records, but under the bank's

standard retention period, it does not retain documents back to the time period at issue herein.

*See* Declaration of James R. DeVita (Doc. No.  1054-1, filed on March 18, 2021, regarding status

of discovery) ("DeVita Dec. II"). [1]  Thus, we address the government's violation of its duty to

preserve evidence.

ARGUMENT

THE GOVERNMENT VIOLATED THE JULY 2018 ORDER
AND ITS DUTY TO PRESERVE EVIDENCE

We begin our argument by addressing the duty to preserve evidence.

A.  The Duty To Preserve Evidence

The principles governing the duty to preserve evidence were summarized in a recent

federal district court decision granting sanctions for spoliation of evidence:

> Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does
> the duty to preserve attach, and *what* evidence must be preserved?" *Luellen v. Hodge*, No.
> 11 Civ. 6144 (MWP), 2014 U.S. Dist. Lexis 42527, 2014 WL 1315317, at *5 (W.D.N.Y.
> Mar. 28, 2014) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y.
> 2003)).  "The obligation to preserve evidence arises when the party has notice that the
> evidence is relevant to litigation or when a party should have known that the evidence may
> be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir.
> 2001).  The "duty to preserve extends to documents in the possession of third parties so
> long as [a party to the litigation] has control over the documents." *Luellen*, 2014 U.S. Dist.
> Lexis 42527, 2014 WL 1315317, at *5.  The concept of control is to be construed broadly,
> and "[d]ocuments are considered to be under a party's control if the party has the practical
> ability to obtain the documents from another, irrespective of his legal entitlement." *Ronnie
> Van Zant, Inc. v. Pyle*, 270 F.Supp.3d 656, 669 (S.D.N.Y. 2017) (internal quotation marks
> & citation omitted), *rev'd on other grounds*, 906 F.3d 253 (2d Cir. 2018).

---

[1] Petitioners' counsel is in the process of serving subpoenas on the two law firms that
represented J&G in connection with the grand jury investigation to confirm that the bank records
have, in fact, been lost.  DeVita Dec. III ¶ 19. n. 2.

*Funk v. Belneftekhim*, 2020 U.S. Dist. Lexis 8890, at * 15 (E.D.N.Y. Jan. 17, 2020).

1. Notice and Control

The government has known of the significance of the J&G bank records since at least June of 2009, when it applied *ex parte* for a seizure warrant for financial accounts allegedly owned or funded by Paul Daugerdas. *See* August 27, 2012 Declaration of AUSA Stanley J. Okula, Jr. (Doc. No. 558) (DeVita Dec. III, Ex. J) ¶ 2. The government was well aware at the time it applied for that warrant that some of the accounts it was seeking to seize and forfeit were in the name of one or the other of the petitioners. Also, the government has had possession of the redacted J&G bank statements since April 2007, when the bank records were produced by J&G's counsel to the government pursuant to grand jury subpoenas. The government submitted selected, redacted pages of the J&G Illinois bank statements from that April 2007 production to the Court as an exhibit to AUSA Okula's August 27, 2012 declaration. *Id*. ¶6, Exhibit 7; DeVita Dec. III, Ex. L.

These two redacted pages from the December 1999 and December 2000 statements of the J&G Illinois bank account reflected approximately $60 million in year-end payments to Paul Daugerdas and were a critical part of AUSA Okula's presentation in the criminal forfeiture case. The defendant Paul Daugerdas had contended that the tax shelter fees were not segregated in the J&G Illinois bank account but were commingled with fees generated by numerous other J&G lawyers for services provided to their clients. *See*, *e.g.*, Daugerdas' Motion To Vacate Restraining Order (Doc. No. 545, filed on August 8, 2012). The legal principles for tracing tainted funds that are allegedly commingled with other funds in a bank account were well-established in the Second Circuit long before the criminal investigation and prosecution of Paul Daugerdas, and remained established during the prosecution and appeal in the criminal case. *See*

*United States v. Banco Cafetera Panama*, 797 F.2d 1154, 1158-60 (2d Cir. 1986) (discussing recognized tracing principles involving first-in first-out and first-in last-out methodologies); *United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (where "some funds in a seized bank account are traceable to criminal activity and some are not, we consult *Banco Cafetera*"). *See also United States v. Rothstein, Rosenfelt, Adler, P.A.*, 717 F.3d 1205, 1212-1214 (11th Cir. 2013) (Court upheld third-party claim under 21 U.S.C. § 853(n)(6) involving commingled funds in a law firm's bank account, citing among other cases, *Banco Cafetero*). In that context, upon reviewing those two critical redacted year-end bank statements, any experienced prosecutor – and AUSA Okula was most certainly an experienced prosecutor – should have recognized the need for the complete, unredacted bank statements for December 1999 and December 2000, as well as for the complete, unredacted statements for the prior months in those two years, for use in the criminal case. The government had the burden of proof in the criminal forfeiture case. Those unredacted bank statements would either establish its contention that there was no commingling of funds, or would disprove any such notion.

Thus, the government had notice of the significance to this forfeiture litigation of the J&G bank records, and had control of the J&G bank records, at least as early as June 2009. Moreover, the government introduced in evidence at the criminal trial a chart (Govt Ex 1999-21; DeVita Dec. III Ex. O) detailing (by date, amount and name of entity) each payment by J&G to Paul Daugerdas related entities from January 1, 1999 to November 18, 2005. The government has stated that this chart was produced by J&G rather than being prepared by the government. Since it was able to obtain the chart from J&G, as well as the redacted bank records, the government plainly had the ability to obtain unredacted bank records which would show whether or not commingling of funds occurred before each payment was made. Under the governing

broad concept of control, once the government served its grand jury subpoenas, it had both the

practical ability to obtain the complete bank statements from J&G's attorneys upon demand, as

well as legal entitlement to obtain the complete statements.  Thus, at a minimum, the

government's prosecutors had the ability and duty either to *direct* J&G and its attorneys to

preserve the complete bank records, or to obtain and preserve the records itself.  *Funk v.

Belneftekhim*, *supra*, at *17-19.  Yet here the government neither issued such a direction to

preserve, nor did the prosecutors obtain and preserve the unredacted bank records themselves.

Moreover, "a party's duty to preserve evidence goes beyond the sending of a litigation

hold notice to the individual in possession or control of evidence."  *Bagley v. Yale University*,

318 F.R.D. 234, 238 (D. Conn. Dec. 22, 2016).  Rather, compliance with a litigation hold notice

"must be monitored"; such notice is "the first in a series of related steps necessary to ensure that

preservation."  *Id*. at 239 (internal citation omitted).  Furthermore, where a duty to preserve

evidence has arisen, the court may grant discovery of information and documents relating to

whether the duty has been violated, including materials relating to litigation hold notices.  *Id*. at

241, text and n. 5.  We therefore seek discovery relating to violation of the duty to preserve in

support of this motion.

The government admits that some time prior to April 2007, the same United States

Attorney's Office for the Southern District of New York, which prosecuted this case as well as

the Ernst & Young case, served one or more grand jury subpoenas on Jenkens & Gilchrist

("J&G") which called for the production of the bank records relating to the receipt and

disposition of fees from Paul Daugerdas's tax shelter clients.  *See* March 31, 2021 letter to the

Court from AUSA Kiersten A. Fletcher (Docket No. 1059) ("Gov. Ltr.") at 5.  The April 2, 2007

cover letter from the law firm DPW to the government transmitting documents in response to the

grand jury subpoenas, which letter the government provided in discovery, reveals that (a) the enclosed materials were being produced pursuant to "grand jury subpoenas" (plural); (b) there had been at least one conversation between the attorneys at DPW and the AUSA to whom the letter was addressed regarding the scope of the subpoenas; (c) copies of the documents were being produced to the IRS investigators simultaneously; and (d) copies of the documents had been previously produced to the United States Attorney's Office on disks.  DeVita Dec. III Ex. I.

The government argues that because the redacted documents it has produced in discovery were what it received with the April 2, 2007 letter from DPW, it did not have "possession" of the complete, unredacted bank statements.  Gov. Ltr. at 6-7; *see* DeVita Dec. III ¶ 19.  The issue, however, is not what the government "possessed," it is whether the government had "custody or control" of the bank records.  Accepting the government's argument requires the illogical conclusion that the complete, unredacted bank statements were not covered by the grand jury subpoenas originally served on J&G.[2]  Moreover, the government's argument completely

---

[2] Although the government has not produced the relevant grand jury subpoenas, it is inconceivable that they called for only redacted copies of the original documents, and selected pages rather than the complete bank statements in question.  *See* DeVita Dec. III ¶¶ 18-19.  The government does not even claim, in its unsworn representations, that the subpoenas only called for redacted copies.  *See* Gov. Ltr. at 5.  Thus, the government, in its various conversations with DPW, must have agreed to accept selected, redacted copies in lieu of the complete documents.  The problematic aspects of production of redacted documents are well-illustrated in *United States v. Zangrillo*, 2020 U.S. Dist. Lexis 36364, at *7-8, 20-21, 25-28 (D.Mass. March 3, 2020) (discussing the reasons why redacted documents produced pursuant to a Rule 17( c) subpoena in a criminal case "simply are unworkable" in discovery and "unwieldy, if not impossible, to use at trial"; such documents in unredacted form had been produced to the government pursuant to a grand jury subpoena).  At all events, it would be a gross breach of standard operating procedure and fundamental principles of the duty to preserve evidence discussed herein for the government to accept selected, redacted copies and not to direct the subpoena recipient to preserve the complete originals for later comparison or review.  *See* DeVita Dec. III ¶ 18.

disregards the broad scope of the terms "custody or control" in the context of grand jury

subpoenas, as well as the venerable history of the broad scope and same meaning of that term

under civil and criminal discovery rules.

As this Court ruled in *In re Various Grand Jury Subpoenas*, 235 F.Supp. 3d 472

(S.D.N.Y. 2017) (Pauley, J.):

> "The phrase, 'possession, custody or control' has a venerable history in the federal rules of procedure." *United States v. Stein*, 488 F. Supp. 2d 350, 360 (S.D.N.Y. 2007). It first appeared in the relevant discovery provisions of the Federal Rules of Civil Procedure, and subsequently was incorporated into the Federal Rules of Criminal Procedure. *Stein*, 488 F. Supp. 2d at 350-51. "There is no hint in the history of these rules that the meaning of the phrase differs depending upon which rule is in question. To the contrary, the phrase in each case defines in identical language the extent of the obligation of a party subject to a duty to produce evidence to respond." *Stein*, 488 F. Supp. 2d at 351. Therefore, although Subject E maintains that the phrase "care, custody, or control" is inapposite in the context of a criminal investigation involving violations of the Bank Secrecy Act, "[c]ommon sense, not to mention settled principles of construction, suggests a uniform construction. Hence, case law under all of the relevant rules – [civil and criminal] – is equally instructive." *Stein*, 488 F.Supp. 2d at 351.

*In re Various Grand Jury Subpoenas*, *supra*, 235 F.Supp. 3d at 478. This Court then held that

the test for production of documents in response to a grand jury subpoena is "'control, not

location . . . . [C]ontrol is defined as "the legal right, authority, or practical ability to obtain the

materials upon demand.'" *Id*. at 478 (citations omitted). And as shown above, the term

"control" has this same uniform meaning in the correlative context of the duty to preserve

evidence.

In sum, the documents Petitioners seek were clearly under the constructive control of the

government from at least the time when the grand jury subpoenas that precipitated the April 2,

2007 production were served on J&G.

2. <u>Culpable State of Mind</u>

The failure to comply with the duty to preserve the bank records warrants sanctions where the party acted with a "culpable state of mind."  Under the law applicable here, this factor includes ordinary negligence and gross negligence.  Where ordinary negligence has occurred, a showing of prejudice must also be made.  Here, the failure to preserve key bank records clearly hinders petitioners' ability to show that the funds were commingled in J&G bank accounts.  Where gross negligence has occurred, the requisite "culpable state of mind" is satisfied and prejudice may be presumed.  *Funk v. Belneftekhim*, *supra*, at *20-26.  Under the circumstances of this case, the failure by the government to preserve the bank records would amount "at a minimum" to ordinary negligence; and failure by the government to "issue a written litigation hold" to J&G's counsel would "support a finding of gross negligence."  *Funk v. Belneftekhim*, *supra*, at *21-22.  *See Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-113 (2d Cir. 2002) (discussing "culpable state of mind" principles, including ordinary negligence, purposeful sluggishness,[3] gross negligence, and a range of sanctions).  As the government failed to issue a written direction to DPW to preserve the bank records, the gross negligence standard is met.

---

[3] In *Residential Funding*, the Second Circuit ruled that "purposeful sluggishness" by a party in responding to questions about unproduced or missing documents may support an inference that the party was grossly negligent and that missing documents were likely harmful to the party.  *Id.* at 109-110.  The responses there included representations that documents would be produced without mentioning the absence of documents from the critical time period (*id.* at 109-10), and statements that were "at least careless, if not intentionally misleading" regarding the "effort to retrieve the documents" (*id.* at 111).  Such characterizations of the government's responses to the district court's order to search for and produce the bank records and its responses to petitioners' discovery requests concerning the bank records would appear to be an apt one.  *See* pp. 1-2, *supra*, and DeVita Dec. I and DeVita Dec. II.  Discovery on this motion will be needed to resolve that issue.

The critical issue of the state of mind of the relevant government actors cannot be determined on the basis of the unsworn, unsupported assertions made by the government.  This is graphically demonstrated by the government's reliance on the Second Circuit's observation, in affirming Paul Daugerdas' conviction, that:

> the J&G account from which Daugerdas was paid held only the funds received by the Chicago office. The trial evidence established that the entirety of the tax-shelter fee income received by J&G's Chicago office—the pool of money from which Daugerdas was paid— was generated by Daugerdas's criminal acts.

*United States v. Daugerdas*, 837 F.3d 212, 231 (2d Cir. 2016), quoted at Gov. Ltr. at 3.  What the government ignores is the fact that the Second Circuit's holding on this point was based on a factual misrepresentation by the government in its brief on appeal – a misrepresentation refuted by the very redacted bank records produced in this ancillary proceeding, and a misrepresentation likely attributable to AUSA Stanley Okula, whose indirect, unsworn representations and explanations the government asks this Court to accept as established fact.

In its brief on the appeal of Paul Daugerdas' conviction, the government acknowledged Daugerdas' argument that the government failed to trace the tax shelter fees from the J&G clients to Daugerdas' PMD Chartered account, and that before the payments were made to Daugerdas, the tax shelter fees were commingled with fees generated by hundreds of J&G lawyers providing services for thousands of untainted client transactions.  The government disputed this contention as follows:

> Daugerdas is simply incorrect in his assertion that the money J&G paid out to Daugerdas was commingled with the "fees generated by hundreds of lawyers." (Br. 38). To the contrary, pursuant to the agreement between J&G and the separate small J&G Chicago office (which Daugerdas led), all of the Chicago office's revenues (mostly generated by Daugerdas's crimes) were required to be deposited into an account belonging to that office, from which a portion was subsequently transferred to Daugerdas's PMD Chartered account. (*E.g.*, Docket Entry 558 Ex. 6 § 2b). Thus, no

10

> client-by-client tracing was necessary to segregate the proceeds of Daugerdas's fraud from J&G's proceeds generally.

Govt Brief on Appeal, at pp. 111-12 (Doc 86, 7/1/2015).

Significantly, the government did *not* argue that all of the Chicago office's revenues *were, in fact,* deposited into a separate account, as the Administrative Services Agreement required – only that the agreement *required* them to be deposited.  This careful, yet awkward, wording appears intentional.  It reflects recognition that the documents the government actually possessed – as opposed to those over which it had constructive control – did not provide the evidence necessary for a "client-by-client" tracing, or to "segregate the proceeds of Daugerdas's fraud from J&G's proceeds generally."  Only complete bank statements for the entire year would show whether the tax shelter fees were *actually* deposited to the J&G Ill. account, and if so, what (if any) funds may have been subsequently transferred out to J&G Texas accounts during the year.

The 400 pages of J&G bank records belatedly produced by the government in this ancillary forfeiture proceeding on November 30, 2020 show that these assertions made by the government to the Court of Appeals were misleading in several material respects.  It is not true that all the tax shelter fees were deposited into, and remained segregated in, the J&G Illinois bank account at the Bank of America throughout the year, and were paid to Paul Daugerdas from that account without being commingled with the general receipts of J&G, or that all payments to Paul Daugerdas came from the J&G Ill. account.  In fact, payments to Paul Daugerdas were made from *five* different J&G bank accounts (three J&G Texas bank accounts, and two J&G Illinois bank accounts).  DeVita Dec. II ¶ 5; DeVita Dec. III ¶ 13; *see* DeVita Dec. II, Ex. A (Docket No. 1054-1).  In fact, of the 298 separate payments to Paul Daugerdas cited by the government for forfeiture from January 1999 through December 2003 (Govt Ex 1999-21), only

11

five of the payments were made from the J&G Illinois bank account at the Bank of America. Indeed, most of the payments were made from three J&G Texas bank accounts. In addition to the two year-end payments cited by the government, it appears that only three other payments came from the J&G Illinois bank account at the Bank of America. There are no payments to Paul Daugerdas from a J&G Illinois bank account after 2001. *See* DeVita Dec. II, ¶ 5, Ex. A.

Furthermore, while the Administrative Services Agreement stipulated that the tax shelter fees be deposited to a J&G Ill. account, the government did not prove that J&G, in fact, actually followed that requirement in practice. Furthermore, only the complete statements for the J&G Ill. account for the full years in question would show whether the tax shelter fees remained segregated in that account for the remainder of the year until used to make year-end payments to Paul Daugerdas, as the government contends. Even if all of the tax shelter fees were deposited in the J&G Ill. account in the first instance, the evidence produced by the government does not preclude the possibility that those tax shelter fees were transferred to other J&G accounts for use in payment of operating expenses during the course of the year, with other untainted J&G funds being returned to the J&G Illinois account as needed to make the year-end payments to Paul Daugerdas.

The government made the above-quoted representations in its brief to the Second Circuit about all of the tax shelter fees being deposited to and segregated in  the J&G Illinois account *without having any bank records* showing the dates and amounts of actual deposits of the tax shelter fees to any of the J&G bank accounts, let alone the dates and amounts of any such deposits to the J&G Illinois bank account at the Bank of America on which its argument hinges; nor did it have any bank records reflecting the dates and amounts of whatever transfers may have been made between that J&G Illinois bank account and other J&G bank accounts. *See* DeVita

Dec. II, ¶ 7.  Moreover, in response to the interrogatories in this proceeding, the government has objected and refused to answer questions as to whether all or only some of the tax shelter fees were deposited to the J&G Illinois bank account, and refused to provide any identification of deposits of the tax shelter fees.  DeVita Dec. II, ¶ 8.

In its letter to the Court opposing petitioners' request for permission to make this motion for sanctions, the government sought to avoid discovery on this motion by making bare factual assertions regarding AUSA Okula's unsworn attempt to explain how or why he was able to use redacted pages from the year-end statements of the J&G Ill. account at the Bank of America in the criminal forfeiture case (which were part of the 400 page production of redacted bank records made by J&G's law firm to the government pursuant to grand jury subpoena in April 2007) without learning about the April 2007 production of bank records.  The government admits that AUSA Okula was involved in the government's search for the bank records following this Court's July 2018 order.  According to the government, AUSA Okula "did not seek the J&G Illinois Records, via subpoena or other request, as part of the criminal case, and did not recall having ever reviewed them." Gov. Ltr. at 4.  Not only is this statement unsworn, it strains credibility as an attempt to explain away the government's violation of the Court's July 2018 order.  Indeed, the government proffers no explanation whatsoever as to how AUSA Okula obtained possession of the two redacted pages that he attached to his August 2012 declaration, let alone how he did so without learning about the April 2007 production of a substantial number of other J&G bank records.  The government also provides no explanation as to why the search for J&G bank records undertaken in 2020 during discovery proceedings was not done in 2018 in compliance with the Court's July 2018 order.

13

It is also worth pointing out that in addition to the redacted pages of the December 1999 and December 2000 J&G Ill. bank statements, the April 2007 document production by J&G's counsel contained other significant documents used by AUSA Okula in the criminal prosecution of Paul Daugerdas, including: 1) the Administrative Services Agreement AUSA Okula attached as an exhibit to his August 2012 declaration (*see* DeVita Dec. III ¶ 7, Exs. J, K) and which he relied on in the above-quoted statement in the government's Brief on Appeal; and 2) the above-referenced chart introduced in evidence at the criminal trial (Govt Ex 1999-21; DeVita Dec. III Ex. O) detailing (by date, amount and name of entity) each payment by J&G to Paul Daugerdas related entities from January 1, 1999 to November 18, 2005.  (*See* DeVita Dec. III ¶¶ 7-8, Ex. E).

The Index to the April 2007 production (DeVita Dec. III Ex. E) also shows that the production included numerous other documents relating to the defendant Paul Daugerdas and the government's key witness, Erwin Mayer, including notes of multiple interviews with both.  *See* DeVita Dec. III ¶ 10.  In short, the factual assertion made by the government as to AUSA Okula's lack of recollection of ever reviewing the production that included J&G bank records is not only unsworn, but also dubious.

The April 2007 DPW production also contained various KPMG-related documents and the Index to the production referred to a database containing over 3,500 KPMG-related documents.  DeVita Dec. Ex. E, Index at 2, and n. 1.  AUSA Okula was part of the team of prosecutors in the criminal prosecution of multiple KPMG partners on charges of tax shelter fraud, which had begun before and continued after the April 2007 production.  At the time, the KPMG case received substantial attention in the SDNY in light of rulings, findings and decisions made by Judge Kaplan on defendants' pretrial motions.  *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006) (holding that the prosecutors had violated defendants' constitutional rights

to counsel and a fair trial by inducing KPMG to cut off payment of their legal fees in
contravention of its longstanding practice of advancing legal fees to its partners); *United States v.
Stein*, 495 F. Supp. 2d 390 (S.D.N.Y. 2007) (dismissing the criminal charges as the appropriate
remedy for the constitutional violations), *aff'd*, *United States v. Stein*, 541 F.3d 130 (2d Cir.
2008).  The findings of constitutional violations were made prior to the April 2007 production,
and the dismissal of criminal charges occurred thereafter.

The members of the prosecution team investigating Ernst & Young were part of the same
United States Attorney's Office, and probably the same Unit within that office, as AUSA Okula
and the prosecution teams in the KPMG and J&G cases.  *See* DeVita Dec. III ¶ 6, n. 1; ¶ 9.  The
similar subject matter and overlapping nature of the three investigations must have been well
known to all the AUSAs and IRS agents involved in them.  The proposition that the Ernst &
Young prosecutors who received the DPW production in April 2007 would have neglected to
bring the numerous significant documents in that production that related to KPMG and J&G to
the attention of Mr. Okula and the IRS agents working with him suggests a level of disfunction
in the United States Attorney's Office that is highly doubtful.

Thus, what the government representatives – both in the United States Attorney's Office
and from the IRS – knew or should have known regarding the whereabouts and contents of the
complete, unredacted bank statements is critical to a decision of the proposed motion, and must
be explored thoroughly through discovery.  The government seeks to avoid responsibility for its
violations of the Court's July 2018 order and its duty to preserve evidence on the ground that the
April 2007 production of bank records by J&G's counsel to the government was made pursuant
to a grand jury subpoena or subpoenas issued by an AUSA other than AUSA Okula, in a separate
but parallel and apparently overlapping investigation relating to the accounting firm Ernst &

15

Young ("E&Y"), conducted by the same SDNY United States Attorney's Office.  The government cites no authority to support its novel position – that the knowledge of prosecutors in the same office conducting related investigations, and the IRS agents working with them, cannot be attributed to one another.

The government simply glides over, and asks this Court to ignore, the significant facts that: 1) while the J&G bank records were obtained by SDNY prosecutors in the E&Y investigation, both prosecution teams were part of the same United States Attorney's Office, the April 2007 production was in the possession of that office, and at least some of the documents from the April 2007 production were shared with AUSA Okula and used in the Daugerdas prosecution; and 2) AUSA Okula obtained possession of key redacted pages from that production of J&G bank records and  used those key pages as a critical part of his presentation in the criminal forfeiture case against Paul Daugerdas.

A careful review of the "bates numbers" on the Administrative Services Agreement and wire transfer records AUSA Okula attached as exhibits to his August 2012 declaration confirms that they came from the April 2007 production, *see* DeVita Dec. III ¶¶ 5, 7; Exs. K, L.  In fact, the two redacted pages from the December 1999 and 2000 statements for the J&G Ill. account he used came from the same batch of documents consisting of approximately 400 pages of selected and redacted bank records from five different J&G accounts, including documents demonstrating payments to Paul Daugerdas from three different J&G Texas accounts.  Including the latter records with his declaration, however, would have undercut – even refuted – AUSA Okula's argument that all of the tax shelter fees received by J&G from Paul Daugerdas' clients were segregated in the J&G Ill. account at Bank of America.

Under these circumstances, the knowledge regarding the J&G bank records obtained by the government in the E&Y investigation – and, even more significantly, the availability of the complete, unredacted bank records – should be "imputed" to the government in the Daugerdas criminal case, regardless of AUSA Okula's unsworn assertion that he does not recall reviewing the April 2007 production of bank records from the E&Y investigation.  *See United States v. Avellino,* 136 F.3d 249, 255 (2d Cir. 1998); *United States v. Nejad*, 487 F. Supp. 3d 206, 2020 U.S. Dist. Lexis 169686*, 2020 WL 5549931 (S.D.N.Y. Sept. 16, 2020).

3. <u>Relevance and Prejudice</u>

The government's assertion that the complete bank statements are not "relevant" to the Petitioners' claims is absurd.  Clearly, they would show, one way or the other, the correctness or not of Petitioners' "information and belief" allegations that the funds deposited to the J&G Illinois account were transferred out and used by J&G to support its overall operations during the year, prior to being returned to the J&G Illinois account at the end of the year for the distribution to Paul Daugerdas of the balance of his compensation for the year.  Indeed, it was the government's recognition of the relevance of these documents that led it to agree to produce them when requested by Petitioners' counsel at the July 2018 conference with the Court, leading to the Court's order that it do so.  *See* Transcript of July 25, 2018 Conference (Docket No. 939), p. 4, line 11 to p. 5, line 6; p. 8, lines 16-21.

Moreover, the government's argument in its letter reveals a fundamental fallacy and glaring hole in the proof on which it relies.  Thus, the government claims that its "initial review of the 2007 DPW Production reveals that . . .  the J&G Illinois Account . . . received payments from Paul Daugerdas' tax shelter clients as contemplated by the J&G Administrative Services Agreement . . . ."  Gov. Ltr. at 5.  In fact, the selected and redacted bank records do not, and

cannot, show that the tax shelter fees were, in fact, deposited to the J&G Illinois Account in accordance with the J&G Administrative Services Agreement, as opposed to being deposited into one or more of the other J&G bank accounts from which multiple payments were made to Paul Daugerdas throughout the relevant years.  The mere fact that the J&G Illinois Account had a large enough balance to make the sizable transfers to Paul Daugerdas at the year-end does not show when those balances came about, or that they were the result of the direct deposit into that account of the tax shelter fees when received by J&G.  *See* DeVita Dec. III ¶¶ 11-12.

Similarly, even assuming the tax shelter fees were initially deposited into the J&G Illinois Account when received by J&G, the government's failure to preserve the full bank statements deprived petitioners of the ability to demonstrate whether there were significant transfers out to the other accounts of J&G for the support of J&G's overall operations that resulted in commingling of those funds with untainted funds.[4]   Thus, Petitioners have clearly been prejudiced by the government's failure to preserve the records, and the Court should "plac[e] the risk of erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction [i.e., the government]," and "restor[e] the party [i.e., Petitioners] harmed by the loss of evidence helpful to its case to where the party would have been in the absence of the spoliation."  *In re Pfizer Inc. Sec. Litig.,* 288 F.R.D. 297, 313 (S.D.N.Y. 2013), cited at Gov. Ltr. at 6.  The sanction of an adverse inference where the culpable conduct is only "negligent" may

---

[4] According to the former Executive Director of J&G Texas, at times there were transfers between the J&G Illinois and J&G Texas accounts and, to the extent that funding was required for payment of major expenditures or year-end compensation, payments were made by J&G Texas.  Declaration of Roger Hayse dated May 3, 2019, DeVita Dec. III Ex. C.

be appropriate "because each party should bear the risk of its own negligence." *Residential*

*Funding Corp. v. DeGeorge Financial Corp.*, *supra*, 306 F.3d at 108.

Furthermore, the government disregards the point that where (as is likely the case here) the culpability rises to the level of gross negligence, that conduct alone can suffice to support prejudice.  Moreover, as the Second Circuit held in a case involving nonproduction of evidence, a "judge's finding that a party acted with gross negligence or in bad faith with respect to discovery obligations is ordinarily sufficient to support a finding that the missing or destroyed evidence would have been harmful to that party, even if the destruction or unavailability of the evidence was not caused by the acts constituting bad faith or gross negligence."   *Residential Funding Corp. v. DeGeorge Financial Corp.*, *supra*, 306 F.3d at 113.

B.  The Appropriate Sanctions for the Government's Violations of the July 2018 Discovery Order and the Duty to Preserve Evidence

The Court's July 2018 Order directed the government to search for and produce the J&G bank records for petitioners' use in preparing the amended petition called for by the Second Circuit's decision reversing the earlier dismissal of the original petition.  It is undisputed that the government failed to comply with that order in a timely fashion – i.e., prior to the filing of the amended petition.  In March 2019, the government represented that it tried to locate the bank records and had "confirmed" that it does not have them.  DeVita Dec. I, at p. 5 and Ex. D.  That representation turned out to be inaccurate.   As shown by the document production made to the government by J&G's counsel pursuant to grand jury subpoena in April 2007, which was belatedly produced to petitioners' counsel by the government on November 30, 2020, the government in fact had possession of redacted copies of about 400 pages of J&G bank records since April 2007.  The government *still* has not complied with the Court's Order since it has not

produced the complete, unredacted bank records.  The issue now before the Court is the

appropriate sanction for violation of the July 2018 order.

The government disputes petitioners' position that the government has violated the duty

to preserve evidence.   However, for the reasons set forth in subdivision A above, with respect to

the unredacted bank records that the government has still failed to produce, petitioners have

shown that the government violated its duty to preserve evidence.  At each of the following

times, the government: 1) knew of the significance of the J&G bank records; 2) had possession

of redacted J&G bank records produced to it in April 2007 that belied the factual representations

it made to the Second Circuit to uphold its contention that there was no commingling of funds;

and 3) had control of unredacted J&G bank records material to its contention of no commingling

of funds:

> ● June 2009 when it applied *ex parte* for a seizure warrant for financial accounts
> allegedly owned or funded by Paul Daugerdas, including accounts in petitioners' names; ;
>
> ●August 2012 when it submitted its opposition to defendant Paul Daugerdas' motion to
> vacate the restraining order (which sought vacatur on the ground that the funds were not
> segregated in the J&G Illinois bank account but were commingled with fees generated by
> numerous other J&G lawyers for services provided to their clients, Doc. No. 545 filed on
> August 8, 2012);
>
> ●June 2014 when it applied for and obtained a preliminary order of forfeiture, which
> defendant Paul Daugerdas opposed on the ground that the funds were not segregated and
> were commingled with the general receipts of J&G (Doc. No. 831 filed on June 23,
> 2014);
>
> ●July 2015 when it represented in its brief to the Second Circuit that the funds were not
> commingled but were deposited to and segregated in the J&G Illinois bank account at the
> Bank of America (at that time, petitioners' initial petition in this ancillary proceeding had
> been filed on August 29, 2014, the government had moved to dismiss the petition, and the
> matter was held in abeyance pending the Second Circuit's  determination on the appeal in
> the criminal case);
>
> ●July 2018 when the district court directed that it search for and produce the J&G bank
> records for use by petitioners in preparing an amended complaint; and

●March 2019 when it represented that it tried to locate the J&G bank records and had confirmed that it did not have them, and moved to dismiss the amended petition on the ground that its allegations of commingling were insufficient as a matter of law.

Yet at no time during this decade-long period did the SDNY prosecutors take steps either to direct J&G or its counsel DPW to preserve the J&G bank records or to take possession of and preserve the bank records themselves.  Thus, we address the issue as to the appropriate sanction for this longstanding continuing violation of the duty to preserve evidence.

1.  The Appropriate Sanction for Violating the July 2018 Discovery Order

Where, as here, a party has violated a discovery order by failing to produce documents in a timely fashion, the district court has "broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial with an adverse inference instruction."  *Residential Funding Corp. v. DeGeorge Financial Corp.*, *supra,* 306 F.3d at 101, 112-113.  Such broad discretion includes: 1) delaying the next stage of  the case to allow a party to pursue a motion for sanctions with the benefit of discovery on issues relating to breach of discovery obligations and culpable state of mind, appropriate depositions, and an evidentiary hearing if  appropriate; 2) upon consideration of the motion, *vacating* a judgment already entered in the case where the belatedly produced evidence shows that the party was prejudiced by the failure to timely produce the evidence; and 3) awarding costs including legal fees caused by the failure to comply with discovery obligations.  *Id*.  at 112.  Such sanctions are appropriate in this case.

Here, the preliminary order of forfeiture was upheld by the Second Circuit on the basis of factual inaccurate representations made by the government in its Brief on Appeal and adopted by the Second Circuit in its decision.  Significantly, as shown in subdivision A(2) above, the

belatedly produced bank records clearly show that those factual representations made by the government to the Second Circuit were demonstrably untrue and misleading in several material respects. See pp. 10-11, *supra*.

Indeed, the government is constrained to acknowledge that the belatedly produced bank records from the April 2007 production show that at least $10 million of the payments to Paul Daugerdas were made from different J&G bank accounts than the J&G Illinois bank account at the Bank of America relied on by the government in its criminal forfeiture case. Gov. Ltr. at 5; *see* DeVita Dec. III ¶ 24.[5] In short, those funds were *not segregated* from the general receipts of J&G and paid to defendant Paul Daugerdas from that J&G Illinois bank account as the government represented to the Second Circuit. While the forfeiture order may be "final" as to the criminal defendant, it is only "preliminary" as to petitioners under the express provisions of Fed.R.Crim.Pr. 32.2(b)(4). Accordingly, upon this motion for sanctions, the preliminary order of forfeiture should be vacated as to petitioners with respect to the millions of dollars of payments made from different J&G bank accounts than the J&G Illinois bank account at the Bank of America.

This point is further supported by the Second Circuit's treatment in *United States v. Watts*, 786 F.3d 152, 163-64 (2d Cir. 2015), of the government's criminal forfeiture claim against a third-party account holder (USW) arising from a preliminary order of forfeiture in a criminal case. In *Watts*, the Court ruled that the government's criminal forfeiture claim against the funds in USW's account at Chase, as property subject to criminal forfeiture as proceeds of

_____

[5] Significantly, even with respect to the payments that were made from the J&G Illinois bank account at the Bank of America, as previously discussed, the government has not presented evidence in this ancillary proceeding showing that the payments were made from segregated funds that had not been commingled with J&G's general receipts.

the crime, gave the government an independent legal claim to the funds that was "superior" to any claims to the funds by the criminal defendant.   That criminal forfeiture claim to the USW Chase funds in turn gave the government a criminal forfeiture claim against the account holder of such funds (USW), regardless of whether the account holder was charged in the criminal case or was a party to the criminal trial, provided and *to the extent* that the funds were "properly subject to" the preliminary order of forfeiture.  *Watts*, 786 F.3d at 163-64.

Thus, in the case at bar, the government has a criminal forfeiture claim against the account holders of the funds at issue (petitioners herein) only to the extent that the funds are "properly" subject to the preliminary order of forfeiture in the criminal case.  Plainly, where as here  the preliminary order of forfeiture was obtained on the basis of factual representations by the government now shown to be untrue and misleading based on bank records that were then in the possession of the government, the funds are *not* "properly subject to" the preliminary order of forfeiture.

In the criminal case against Paul Daugerdas, the government did rely on approximately $60 million dollars in year-end payments made from the J&G Illinois account at the Bank of America to Paul Daugerdas in December 1999 and December 2000.  However, in this ancillary proceeding the government has not presented evidence from the criminal case showing that those payments were made with funds that had been deposited to that J&G Illinois account by tax shelter clients of Paul Daugerdas and that had remained in the account segregated from the general receipts of J&G until the year-end payments were made.  See *pp*. 10-12, *supra*.  Thus, the funds at issue here are not "properly subject to" the preliminary order of forfeiture. Since that is the case, the preliminary order of forfeiture should be vacated in its entirety as to petitioners.

2. <u>The Appropriate Sanction for Violating the Duty to Preserve Evidence</u>

In *Residential Funding Corp. v. DeGeorge Financial Corp.*, *supra,* 306 F.3d at 101, 112-113, the Second Circuit addressed the range of sanctions that may be appropriate under the district court's broad discretion.  *See also West v. Goodyear Tire & Rubber Company*, 167 F.3d 776, 779-780 (2d Cir.  1999) (discussing sanctions ranging from outright dismissal to a presumption or adverse inference against the spoliator's contention, and/or precluding the spoliator from offering evidence in support of its position).  As the Second Circuit stated in *West*, it "has long been the rule that spoliators should not benefit from their wrongdoing," *id*. at 779.

After discovery on the issues relating to the duty to preserve evidence, we will be more specific as to the sanctions within the court's broad discretion that would be appropriate in this case.  Suffice it to state now that even in the absence of bad faith, the government's violation of the duty to preserve evidence should at the very least be subject to sanctions that  include discovery on the issues relating to a duty to preserve evidence, an adverse inference or presumption against the government's position that there was no commingling of funds, an order precluding the government from introducing evidence in support of its position that there was no commingling of funds, and an order requiring the government to pay reasonable expenses including legal fees caused by its failure to preserve and  timely produce the J&G bank records.

**Conclusion**

The government was in a unique position to preserve the evidence at issue on this motion, which was under its constructive control since at least April 2007.  It had served one or more grand jury subpoenas covering it, and at least by the time it applied for and obtained a warrant restraining the assets in petitioners' names, it either recognized the relevance of that evidence to

the forfeiture issues it was raising, or should have recognized it.  Petitioners, on the other hand, had no opportunity to act to obtain or preserve the evidence.  They were precluded by law from pursuing any remedy to protect their interests in the property until after the entry of the preliminary order of forfeiture in June of 2014.  21 U.S.C. § 853(k).  Even thereafter, the Petitioners' ability to obtain and preserve the evidence was proscribed by the government's motion to dismiss the initial petition; the Court's initial grant of that motion; the pendency of the appeal from that dismissal; and the government's second motion to dismiss the amended petition.  At the earliest possible opportunity, at the July 2018 status conference following the Court of Appeals' reversal of the dismissal of the original petition, Petitioners' counsel asked the government to produce the relevant bank records and the Court ordered them to do so.  The Court should, at the very least, permit petitioners to conduct discovery, including depositions of the current and former government officials from the United States Attorney's Office and the IRS with knowledge of the facts.  Upon conclusion of that discovery, the Court should grant petitioners relief that will restore them to the position they would have been in had the government complied with the Court's July 2018 Order and fulfilled it obligation to preserve evidence.

Dated:  April 30, 2021
      White Plains, New York

                    s/ James R. DeVita___
                    **James R. DeVita (JRD 5659)**
                    LAW OFFICES OF JAMES R. DeVITA, PLLC
                    81 Main St., Suite 504
                    White Plains, New York 10601

                    Of Counsel:
                    Ronald E. DePetris
                    P.O. Box 6034
                    Southampton, New York 11969
                    (631) 283-8652